UNITED STATES of America, Plaintiff,

v.

$186,416.00 IN U.S. CURRENCY, Defendant.

United Medical Caregivers Clinic, Inc., Claimant.

No. CV 05–6703 SVW (SHx).

United States District Court, C.D. California.

Aug. 10, 2007.

Greg Parham, Office of U.S. Attorney, Asset Forfeiture Division, Los Angeles, CA, for Plaintiff.

Charles L. Lindner, Charles L. Lindner Law Offices, Paul L. Gabbert, Paul L. Gabbert Law Offices, Santa Monica, CA, David B. Smith, English & Smith, Alexandria, VA, for Claimant.

## ORDER DENYING CLAIMANT UNITED MEDICAL CAREGIVERS CLINIC, INC.'S CONVERTED MOTION FOR SUMMARY JUDGMENT [42, 50]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

In evaluating this unusual case, the Court and the parties have encountered complicated and thorny questions at every turn. This converted motion for summary judgment is no different. The Government filed its verified complaint on Sep-

tember 12, 2005, against the defendant $186,416.00 in United States currency. This federal civil forfeiture action arose from the Los Angeles Police Department's ("LAPD") seizure, pursuant to a state search warrant, of marijuana, currency, and other items from claimant United Medical Caregivers Clinic, Inc. ("UMCC"). UMCC is, or was, a non-profit medical marijuana dispensary in Los Angeles, located at 4520 Wilshire Boulevard. The verified complaint for forfeiture was brought under 21 U.S.C. § 881(a)(6), with the Government alleging that the defendant currency was traceable to federal narcotics violations pursuant to 21 U.S.C. §§ 841, 846.

On August 16, 2006, ("August 16 Order") this Court granted UMCC's motion to quash the search warrant and suppress the defendant currency. The Court held that the evidence seized *during* the search had to be suppressed because: (1) there was no probable cause to issue the state warrant for a violation of state law; and (2) even assuming that the warrant was issued in response to a violation of federal law, Federal Rule of Criminal Procedure 41(b)'s procedural requirements were not observed.

UMCC asked this Court to enter judgment in its favor immediately after the August 16 Order was issued. The Court deemed this request to be premature. *See United States v. One 1977 Mercedes Benz,*

708 F.2d 444, 450 (9th Cir.1983) ("[A]ny evidence which is the product of an illegal search or seizure must be excluded at trial, but ... forfeiture may proceed if the Government can satisfy the requirements for forfeiture with untainted evidence.").[1] Given the case's uncertain status, the Court issued an Order on November 21, 2006. This Order stayed discovery in order to permit UMCC the opportunity to file a dispositive motion. UMCC subsequently filed a motion for judgment on the pleadings. However, the Court determined that this motion was procedurally awkward,[2] and converted it to a summary judgment motion.

Importantly, this converted motion for summary judgment involves a narrow inquiry: whether the Government had sufficient evidence to initiate the lawsuit against the defendant currency on September 12, 2005. The question is whether, as of that date, the Government had untainted probable cause connecting the defendant currency to federal narcotics violations. This motion does not consider whether the Government could meet its burden of proof of establishing forfeitability by a preponderance of the evidence at trial.

For the reasons discussed below, UMCC's converted motion for summary judgment is DENIED.

---

1. In *United States v. $191,910.00,* 16 F.3d 1051 (9th Cir.1994), the Ninth Circuit affirmed a district court's order granting claimant's motion for summary judgment, which was brought after a successful suppression motion. This Court has followed *$191,-910.00's* example for purposes of this case.

2. The Court found it difficult to accept UMCC's theory that the Government could not retrospectively plead the original forfeiture complaint in good faith under Rule 11 as a result of a subsequent suppression ruling. If accepted, then in an ordinary civil case, a

plaintiff would no longer be able to plead facts in a complaint that were excluded as a result of a motion in limine on the eve of trial. The Court is unaware of any case permitting a motion for judgment on the pleadings to be employed in this manner. The key issue is whether the Feil declaration, and UMCC's related state courts motions, are admissible. This case has been on the Court's docket for nearly two years, and it would be inefficient for the Government to now file a first amended verified complaint. Summary judgment is the most expeditious mechanism for resolving the central questions examined herein.

## II. FACTS

The Government filed its verified complaint on September 12, 2005. (Cl. MJOP Brief Ex. 1.) The complaint alleges that the defendant currency was seized while the Los Angeles Police Department ("LAPD") conducted a search of UMCC's premises, and that it was traceable to narcotics violations codified at 21 U.S.C. §§ 841, 846. Given the posture of this converted motion, it is imperative that the Court limit its analysis to the evidence known to the Government as of September 12, 2005. The underlying and material facts[3] are undisputed, but the resulting implications have been vigorously argued by counsel.

### A. Events Leading to the Seizure

In January 2005, Sergeant Lopez began receiving complaints of marijuana smoking near the UMCC facility. (Lopez Decl. ¶ 3.) The complainants observed marijuana being carried in small brown paper bags. (*Id.*)

On March 15, 2005, Lopez received another complaint that for the first time identified UMCC as the source of the marijuana activity. (*Id.* ¶ 4.) He drove to the area in the early evening, and found a flyer that referenced "UMCC." (*Id.*) The flyer informed UMCC patrons to leave the premises after purchasing their marijuana, but did not include an address. (*Id.*) After asking some locals about the flyer, he eventually was led to 4520 Wilshire Boulevard. (*Id.*) As he approached the building's entrance, he noticed that an individual (possibly a private security guard) with a walkie-talkie was following him and spoke the following words into his headset: "LA's finest is here." (*Id.* ¶ 5.) Inside the building, Sergeant Lopez smelled the odor of marijuana and observed a number of people leaving the building with small brown paper bags. (*Id.* ¶ 6.) When he ascended to the second floor, he saw a sign that advised UMCC customers to show their identification cards[4] before entering. (*Id.*) He also noticed that he was being followed by the same security agent. (*Id.*) At approximately this time, Michael E. Bryan, a private security consultant who was then working for UMCC, states that he told Lopez that UMCC was a "legal dispenser of medical marijuana." (Bryan Decl. ¶ 3.)

Sergeant Lopez was then "buzzed" in to UMCC's offices. Once inside, the smell of marijuana grew stronger and more individuals were seen leaving with brown paper bags. (Lopez Decl. ¶ 7.) After asking to speak with the "person in charge," he met with Gabriella Jaramillo. (*Id.* ¶ 8.) Jaramillo told Lopez that UMCC was a medical marijuana provider, had a business license, and was operating lawfully. (*Id.*) However, she was unable to produce a business license at that moment. Lopez states that "[l]ater, in the course of the investigation, a faxed copy of a City of Los Angeles Tax

---

3. In recounting these events, the Court has relied on the record submitted as part of this summary judgment motion, as well as those facts placed into the record for the purpose of resolving UMCC's motion to traverse and quash the search warrant.

4. The Government has submitted the declaration of Anna Long, who is the Chief of Staff for public health with the LA County Department of Health Services. (Long Decl. ¶ 1.) Long notes that she is responsible for implementing a medical marijuana ID Card pro-

gram in Los Angeles county, pursuant to California's medical marijuana laws. (*Id.* ¶ 2.) LADHS is charged with issuing issue these cards "to patients who have medical authorization to use marijuana and their caregivers." (*Id.* ¶ 3.) As of February 2006, "LADHS ha[d] not issued any medical marijuana I.D. cards whatsoever." (*Id.*) However, since such local I.D. cards had not yet been created, UMCC's failure to produce one on March 15, 2005 should not weigh in favor of a finding of probable cause.

Registration Certificate was produced." (*Id.*) Jaramillo contacted UMCC's owner by phone, who stated that he would fax the entity's business license. (*Id.*) The owner also stated that UMCC was a legitimate medical marijuana provider, and that he had no legal problems with his other location in West Hollywood. As Lopez continued to wait for backup, he witnessed additional individuals leaving the area with small brown paper bags. (*Id.* ¶ 10.) Lopez's backup arrived within approximately 30 minutes and secured the area pending the issuance of a search warrant. (*Id.* ¶ 11.)

Jaramillo also submitted a declaration as part of UMCC's motion to quash the search warrant and to suppress the currency. She states that as of March 15, 2005, all registered patients were required to present a UMCC ID card or a doctor's recommendation letter before they were admitted through the locked second floor door. (Jaramillo Decl. ¶ 3.) The ID card or doctor's note would then be presented to a UMCC employee at the front desk before they could be "buzzed" into the waiting room. (*Id.*) After signing in on a roster sheet, the patients would be admitted to the dispensary through a third locked door. (*Id.*)

Jaramillo claims that she was about to leave UMCC's premises at around 6:00 p.m. on March 15, 2005, when she was told by a security guard (Bryan) and another employee that a police officer wanted to see UMCC's business license. (*Id.* ¶ 4.) UMCC's CEO, Scott Fell, also called Jaramillo at this time. (*Id.*) He was at another location, but saw on his security monitor that a police officer was in the lobby. (*Id.*) Feil told Jaramillo, upon her request, that he would fax over the necessary information. (*Id.*)

Jaramillo further asserts that at this point she began speaking with Lopez, who "asked us what kind of place this was and if we had a license to operate." (*Id.* ¶ 6.) She informed him that this was a medical marijuana clinic operating under Proposition 215. (*Id.*) Lopez reportedly told Jaramillo that he was not familiar with California's medical marijuana laws.[5] (*Id.*) She states that at about this time she:

> received the faxes from Mr. Feil which included UMCC's corporate papers (Exhibit 6) a completed copy of its application for a City of Los Angeles Tax Registration Certificate, and a City of Los Angeles Tax Registration Certification (Exhibit 7 & 7a) which [she] handed to Officer Lopez.

(*Id.*) The city registration certificate lists UMCC as involved in "retail sales." (*Id.* Ex. 7.) The Articles of Incorporation list Scott Feil as UMCC's agent for service of process. (*Id.* Ex. 6.) Jaramillo also pointed Lopez to a flyer that was reportedly in his hand. (*Id.* ¶ 6.) The flyer included the following language:

> Anyone caught smoking, distributing, sharing, selling or using by any means, any item received under the guidelines of Proposition 215 (California Compassionate Care Act of 1996) Health & Safety Code §§ 11362.5 and 11362.7 et seq. on the street or neighborhood within a five block radius of *UMCC*, your membership in this clinic will be immediately revoked for a period of one year from the date of violation without notification.

(*Id.* Ex. 5a.) UMCC hired security officers to police the adjacent neighborhood in order to ensure that this rule was observed. (*Id.* ¶ 6.) Jaramillo claims that Lopez received a call on his phone at this time, and he said "words to the effect that he had something that looked like a li-

---

**5.** This statement seems to contradict Lopez's claim in his declaration that he was aware of

the medical marijuana laws (at least generally) as of March 15, 2005.

cense. 'It says retail and this is supposed to be a clinic.' " (*Id.* ¶ 8.) Lopez told Jaramillo that his supervisor would be arriving. (*Id.*) At this time, Jaramillo asked if she could show Lopez some paperwork on the California medical marijuana laws. (*Id.* ¶ 9.) She provided him with a packet of information that included the statutory language enacted by the Compassionate Use Act of 1996, as well as an article written by William Bratton indicating his support for medical marijuana. (*Id.* Ex. 5.)

At approximately 6:45 p.m., Sergeant Bell arrived. (Jaramillo Decl. ¶ 10.) Jaramillo was not allowed to leave; however, the officers also declined her invitation to close down the clinic. (*Id.*) After Lopez received another phone call, Jaramillo asked once again whether she should close the clinic, and this time was told "yes." (*Id.* ¶ 11.) However, one last elderly patient from Riverside had arrived with a doctor's recommendation, and Lopez permitted the patient to receive her "prescription." (*Id.*) Jaramillo agrees that Lopez probably viewed about 50 patients receiving medical marijuana while he waited for other officers to arrive, but that Lopez never intervened. (*Id.* ¶ 12.) No other patients were allowed into the building after the elderly woman from Riverside left. (*Id.* ¶ 13.) Jaramillo and several other employees were then detained and told to stay in the waiting room. (*Id.* ¶ 16.) It was at this point that Jaramillo saw ten to fifteen other detectives arrive. (*Id.* ¶ 17.)

After the other officers arrived, Lopez spoke by phone with Officer Michael Fukuda, who is a member of the Wilshire Narcotics Enforcement Detail. (Lopez Decl. ¶ 11; Fukuda Decl. ¶¶ 2–3.) Prior to this conversation, but at sometime after 6:00 p.m., Fukuda had already spoken with one of his superiors about UMCC. (Fukuda Decl. ¶ 2.) This superior was Detective Orozco, and it was determined that a state search warrant would be sought. (Fukuda Depo. at 72–73.) Lopez told Fukuda about: (1) the complaints he had received regarding marijuana smoking in the UMCC area; (2) the odor of marijuana at the facility; and (3) the admissions of marijuana sales by UMCC employees. (Fukuda Decl. ¶ 3.) Fukuda testified in his deposition that the information provided to him by Lopez was consistent with that conveyed by Detective Orozco. (Fukuda Depo at 73:11–14.) Lopez and Fukuda only talked on the phone once, and it was likely no longer than a "couple minutes" in length. (*Id.* at 82:7–17.) Before applying for the search warrant, Fukuda was aware of the fact that customers were bringing doctor's notes for the marijuana purchases. (*Id.* at 140:22–25 to 141:1–5.) However, he did not know that Lopez had observed people purchasing marijuana in the police's very presence. (*Id.* at 140:16–21.)

Fukuda drafted a search warrant based on his conversation with Lopez and other officers, which was approved by his superiors. (Fukuda Decl. ¶ 3.) This probably took Fukuda two or three hours to complete. (Fukuda Depo at 76:10–12.) Before applying for the search warrant, Officer Thomas advised Fukuda that a tax registration certificate for UMCC had been located indicating that the company was involved in "retail sales." (*Id.* at 133:17–25 and 134:1–4.) This occurred during the course of a phone conversation between Fukuda and Thomas. (*Id.* 134:13–17.) Thomas did not actually provide Fukuda with a copy of the registration form until after the search was executed. (*Id.* at 135:6–9.) Fukuda did not include this information in the warrant; he thought it was irrelevant because nothing on the certificate states that it was legal for UMCC to sell medical marijuana. (*Id.* at 135:15–24.) Fukuda was aware that "you needed one [a tax registration certificate] in order to operate legally a busi-

ness...." (*Id.* at 136:11–12.)[6] But he did not believe that "retail sales" included the right to engage in medical marijuana sales. (*Id.* at 138:7–13.) In addition, Lopez had relayed to Fukuda that various patients were coming to UMCC with doctors' recommendations, but Fukuda omitted this fact from the affidavit because "we have no standing order that any kind of doctor's recommendation is going to trump the Health and Safety code we go by." (*Id.* at 140:22–25 to 142:1–2.)

The warrant drafted by Fukuda, if approved, allowed the LAPD to search the UMCC facility located on the second floor at 4520 Wilshire Boulevard. (Fukuda Decl. Ex. A at 2.) The LAPD could search for marijuana, marijuana paraphernalia, personal property tending to establishing the existence of a conspiracy to sell marijuana, and personal property tending to establish the identify of persons in control of the premises. (*Id.*) Fukuda also provided an affidavit, which stated the following (in part):

> On March 15, 2005, I was contacted by Officer Miguel Lopez # 25423, who was calling from the United Medical Caregivers Clinic at 4520 Wilshire Boulevard. Officer Lopez stated that he was contacted telephonically by a citizen, who stated he was concerned with narcotics activity occurring in the area of Wilshire Boulevard and Muirfield Avenue. The Citizen stated that on numerous occasions he had observed people smoking marijuana joints in the area of Wilshire Boulevard and Muirfield Avenue. The citizen inquired with them as to where they had obtained their marijuana, and was handed a flyer that made reference to marijuana usage, and the letters

"UMCC." On March 15, 2005, Officer Lopez was in the area of Wilshire Boulevard and Muirfield Avenue, and observed a citizen holding a flyer that made reference to marijuana usage, and the letters "UMCC." Officer Lopez inquired as to where the citizen had obtained the flyer, and was advised by the citizen that "UMCC" stood for the United Medical Caregivers Clinic, was located inside 4520 Wilshire Boulevard, and that the clinic was well known for marijuana sales. Officer Lopez conducted a follow up to 4520 Wilshire Boulevard and observed a hanging sign on a metal stand that had inscribed, "UMCC parking in rear." Upon entering the lobby of 4520 Wilshire Boulevard, Officer Lopez immediately detected a strong odor of marijuana. He further observed a piece of paper taped to the wall that had inscribed, "UMCC" and listed business hours. An arrow was also inscribed on the same paper that pointed up the stairs to the second floor. Officer Lopez walked up the stairs to the second floor and located a door that had a sign posted east of the front door that stated, "Please show your UMCC photo ID card." Upon entry, Officer Lopez detected a strong odor inside the clinic. Officer Lopez recognized this as an odor commonly associated with Marijuana. Officer Lopez then spoke with clinic employees who readily admitted that there was marijuana in the clinic and that they sold marijuana at the location.[7]

Between 8 p.m. and 10 p.m. that evening, Officer Fukuda called the Los Angeles Superior Court and asked to speak with a judge regarding a search warrant.

---

**6.** The Court concedes it erroneously stated in its August 16, 2006 Order that Lopez did not dispute receiving UMCC's tax registration certificate prior to the search. However, this error is immaterial because Fukuda knew of the certificate's existence before submitting the warrant.

**7.** This was only the third search warrant ever written by Fukuda. (Fukuda Depo. at 35:9–13.)

(*Id.* ¶ 4.) He was ultimately connected to Judge Melvin Sandvig, who told Fukuda to explain "what we had" concerning UMCC. (*Id.*) As conceded by Officer Fukuda, he omitted any reference to UMCC's claim that it was a medical marijuana provider, instead only mentioning its name and noting that it was a "clinic." (*Id.*) This conversation only lasted a "couple of minutes." (*Id.*) Judge Sandvig called Officer Fukuda back shortly thereafter and informed him that the warrant had been approved. (*Id.*) Judge Sandvig signed the warrant at 10:20 p.m. (*Id.*)

At that time, Fukuda called the officers at UMCC, informing them that a search warrant had been signed and that he was en route with the written document. (*Id.* ¶ 5.) Fukuda then "went to UMCC and met with Wilshire Narcotics Enforcement Detail officers who had begun a search of UMCC." (*Id.*) It appears to be undisputed that the search began before Fukuda actually arrived with a physical copy of the warrant. As stated by Officer Thomas, "[a]fter receiving Fukuda's call, we began a systematic search of the location." (Thomas Decl. ¶ 5.)

Jaramillo and Bryan assert that the officers engaged in searches prior to this time. There is no implication, however, that any currency was found prior to 10:20 p.m. Bryan, who was a security agent for UMCC, claims that detectives began searching UMCC's files as early as 7:00 p.m. (Bryan Decl. ¶ 4.) He also asserts that these non-consensual searches of the facilities were recorded in real time by UMCC's video surveillance system. (*Id.* ¶ 7.) At some point between 8:30 and 10:00 p.m.,

Jaramillo claims that she received further calls from Feil. (Jaramillo Decl. ¶¶ 19, 24.) Feil reported seeing detectives searching the dispensary on his security video monitor. (*Id.* ¶ 19.) [8]

Officer Keith Thomas found several rooms designed for the sale and storage of marijuana-related products. (Thomas Decl. ¶ 6.) He was assigned the task of collecting money believed to be the fruit of UMCC's marijuana sales. (*Id.* ¶ 7.) Currency and ATM receipts were recovered from a cash register. (*Id.*) Thomas entered a security room that contained a money counter, two safes, and various ledgers. (*Id.* ¶ 8.) Thomas asked a UMCC security guard about the ledgers, who in turn responded that they contained a history of money generated by UMCC that had been placed into the safes. (*Id.*) A special safe cracking unit arrived, and ultimately retrieved large amounts of currency from UMCC's safe. (*Id.*) $186,416.00 in U.S. Currency was seized in total from the UMCC search that evening. (*Id.* ¶ 9.) After searching the premises, LAPD also seized 209 pounds of marijuana, 21 pounds of hashish, and approximately 12 pounds of marijuana oil. (Fukuda Decl. f 5.) Two UMCC employees, Gabriella Jaramillo and Carmen Flores, were arrested for marijuana possession. (*Id.* ¶ 6.) Fukuda also states in his declaration that "[d]uring the course of the search, a faxed copy of a City of Los Angeles Tax Registration Certificate was produced." (*Id.*) [9] While the LAPD were still in the process of removing UMCC's marijuana, Jaramillo was giv-

---

8. Though not stated expressly, Jaramillo's declaration also suggests that UMCC's security chief, Mark Garcia, saw the same images as Feil. (*Id.*)

9. To the extent that Fukuda's declaration suggests that law enforcement were unaware of UMCC's tax registration certificate until the

search was conducted, which would directly contradict his prior deposition testimony, the Court rejects it as a sham. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").

en a copy of the first page of the search warrant. (Jaramillo Decl. ¶ 30.)

One of UMCC's lawyers claims that he spoke with LAPD Captain Fletcher, Command Officers of the Narcotics Division, on March 28, 2005. (Lindner Decl. ¶ 2.) Captain Fletcher stated that he was unaware of any officer training addressing California's medical marijuana law(s), although he agreed that such training would be "appropriate." (*Id.*) This attorney also states that a deputy district attorney is "on call" if law enforcement officials have any legal questions about the issuance of search warrants. (*Id.* ¶ 3.)

### B. The LAPD'S Understanding of Narcotics Law

Lopez states in his declaration that the LAPD had not provided him or his colleagues with any training regarding California's medical marijuana laws. (Lopez Decl. ¶ 9.) He knew that such laws had been passed, but believed that possession and sale was still illegal under federal law. (*Id.*) Lopez asserts that he has a duty to enforce all laws within California, including federal laws. (*Id.*) In his deposition, Lopez also states that he had received no training on medical marijuana laws as of March 15, 2005, and that he had never read them. (Lopez Depo. at 27–28.) He further claimed that, at that time, it was his understanding that marijuana could never be sold legally in the state. (*Id.* at 73.)

Fukuda asserts that as of the search date he "had received no orders from LAPD command staff that we were not to enforce marijuana sales laws." (Fukuda Decl. ¶ 3.) In his deposition, Fukuda at first admitted some awareness, as of March 15, 2005, of California's medical marijuana laws. (Fukuda Depo. at 38:6–

8.) [10] Fukuda "knew that it had been a recent hot topic in the news, especially for the State of California. So [he] knew it through just newspapers and watching the news." (*Id.* at 38:10–12.) Furthermore, Fukuda may have had discussions with other officers about the law, as well as "incidents that involved medical marijuana." (*Id.* at 38:21–23.) Yet, he had not received any training regarding these laws. (*Id.* at 37:23–25 to 38:1–5.)

Fukuda's initial concession of knowledge regarding California's medical marijuana laws arguably contradicts his statements given elsewhere in his deposition. Toward the end, Fukuda asserts that the sale of marijuana was prohibited under all circumstances as of March 15, 2005. (*Id.* at 138:16–19, 139:12–15.) Shortly thereafter, Fukuda once again shifts his position, implying that the medical marijuana law might only apply if the city and county of Los Angeles took certain required steps:

> Like I said before, it was just bits and pieces I heard through the news, especially up in Northern California that there were, in fact, medical marijuana clinics. However, because there were very specific standards that needed to be met for that to become legal, that in other areas of California and other states whether the Compassionate Care Act had been talked about, that it was a gray area and that we were still to operate by our current practice.

> Just as we were guided by the Health and Safety Code, which was basically when we had a crime, a law that was broken, we would enforce it.

(*Id.* at 142:13–25.) Fukuda only read the relevant portions of the law after the search was executed, when discussing the

---

**10.** He had not, however, read any of California's medical marijuana laws as of that date.

(*Id.* at 93:23–25.)

case with a deputy district attorney in the following week. (*Id.* at 148:4–25.)

Finally, Thomas states that he was only "generally familiar" with California's medical marijuana laws but was aware that the ID card program had not yet been instituted. (Thomas Decl. ¶ 5.)

### C. Other Information Known to the Government

Presumably after March 15, 2005, but before September 12, 2005, the federal Government learned of certain additional information pertaining to the defendant currency. First, UMCC was incorporated in California on March 16, 2004. (Biczo Decl. ¶ 2.) Second, a criminal history check of UMCC's President, Scott Feil, revealed that he had been arrested in 2000 for cultivating marijuana. (*Id.* ¶ 3.)

Additionally, on August 4, 2005, Charles Lindner (an attorney representing UMCC), filed a motion in Los Angeles Superior Court entitled, "Motion for Order to Show Cause why the Court's 'Order for Release of Property Pursuant to Search Warrant for Federal Forfeiture Proceedings' Should Not be Set Aside." In this motion, Mr. Lindner attached the contents of a prior motion for the "return of property illegally seized," which had been filed on May 17, 2005. In this earlier motion, UMCC submitted the declaration of Scott Feil, the "Chief Executive Officer" of UMCC. (Biczo Decl. Ex. E at 91.) Feil explained that "[a]ll cannabis products obtained or produced by UMCC are derived form marijuana grown exclusively by patient-members of UMCC. UMCC has never obtained marijuana or cannabis products from any source other than marijuana cultivated by its patient members." (*Id.*)

Feil further declared that on "March 15, 2005, the Los Angeles Police Department seized numerous cannabis products, approximately $200,000 in currency, and other items including security equipment.

The materials seized were all, to the best of my knowledge and belief, legitimately used in the course of UMCC's activities as described above." (*Id.* at 92.) These "activities," as detailed in the Feil declaration, were UMCC's sale of marijuana.

Finally, on August 26, 2005, Judge Sandvig signed a one-page order releasing the defendant currency for federal forfeiture proceedings. The entire order reads as follows:

> Agents of the Los Angeles Police Department have examined the facts in the above-entitled action and have determined that there exists probable cause to believe the assets described below are forfeitable under Title 21, U.S.C. 881. Therefore, it is hereby ordered that the property listed below taken from the possession of Gabriela Jaramillo of United Medical Caregivers Clinic, at the premises located at 4520 Wilshire Boulevard, Los Angeles, California, on or about the date of March 15th, 2005, pursuant to search warrant # 51779, be released from the jurisdiction of the court under authority of 1536 of the California Penal Code. As prescribed by federal law, said property will be retained by the United States Marshals Service pending the disposition of forfeiture proceedings pursuant to Title 21, U.S.C. 881. Description of Property: $186,416.00 in U.S. Currency.

(*Id.* Ex. F.) DEA Task Force Officer Joseph Biczo presented this Order to Judge Sandvig.

### III. ANALYSIS

#### A. Legal Standard Governing Summary Judgment

Rule 56(c) requires the Court to grant summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to

any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1263 (9th Cir.1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000).

Only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party— over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (holding the nonmoving party must provide specific evidence from which a reasonable jury could return a verdict in its favor).

### B. The Probable Cause Standard

#### 1. CAFRA and Section 1615

■ Prior to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"),[11] the Customs law of Title 19 governed efforts to forfeit property allegedly related to drug transactions. *See* 21 U.S.C. § 881(d). Under 19 U.S.C. § 1615, the Government was only required to have probable cause in order to initiate a forfeiture action. Once this was established, the claimant had to prove by a preponderance of the evidence at trial that the defendant property was not forfeitable.[12] As to the probable cause requirement, the Ninth Circuit held in *$191,910.00* that "[t]he plain language of the statute makes clear that the government must have probable cause at the time it institutes the forfeiture proceedings." 16 F.3d at 1066. Therefore, the Government could not make up for its lack of probable cause after the lawsuit began through the use of discovery, or other independent investigation. *See id.* at 1066–67. There is no dispute that CAFRA superseded Section 1615 as to the ultimate trial burden of proof, which now requires the Government to demonstrate forfeitability by a preponderance of the evidence.

"Enacted in 2000, the Civil Asset Forfeiture Reform Act ('CAFRA') sets forth the procedures used in all civil forfeitures under federal law unless the particular forfeiture statute is specifically exempted in 18 U.S.C. § 983(i)(2)." *United States v. 144,774 pounds of Blue King Crab,* 410 F.3d 1131, 1134 (9th Cir.2005).[13] The trouble with CAFRA is that its text is oddly mute as to whether the Government must still

---

11. Pub.L. No. 106–185, 114 Stat. 202 (2000).

12. "[T]he burden of proof shall be upon the defendant: *Provided,* That probable cause shall be first shown for the institution of such suit or action." 19 U.S.C. § 1615.

13. Since narcotics violations are not specifically exempted, they are governed by CAFRA's provisions. *See United States v. $84,615 in U.S. Currency,* 379 F.3d 496, 501 (8th Cir. 2004).

bear the initial burden of demonstrating probable cause to begin the lawsuit. For this reason, the Court previously expressed some skepticism regarding whether the probable cause requirement of Section 1615 survived CAFRA.

Into CAFRA's apparent silence, the opposing sides have declared victory. One Department of Justice attorney wrote that "[f]rom the outset of the debate over CAFRA, the Department of Justice assigned a high priority to" repealing this portion of Section 1615, "and ultimately Congress agreed." Stefan D. Cassella, *The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties*, 27 J. Legis. 97, 149 (2001). In contrast, one of UMCC's lawyers edits an oft-cited treatise on asset forfeiture law, and offered the following retort:

> The DoJ argues that Congress spoke to this issue in the CAFRA and overruled the line of cases holding that the government must have probable cause at the time it files the complaint. To the contrary, Congress implicitly approved this line of cases in 18 U.S.C. § 983(c), which provides that the "government may use evidence gathered after the filing of a complaint for forfeiture to establish, *by a preponderance of the evidence*, that property is subject to forfeiture." By using the [underlined] phrase, Congress clearly meant to relieve the government of the need to establish the forfeitability of the property by the new burden of *a preponderance of the evidence* without using evidence acquired after the complaint was filed. Congress thought it was enough that the government have *probable cause* at the time it commenced the forfeiture action, as under the old

law. Section 983(a)(3)(D) says the same thing: "No complaint may be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." Of course, under the CAFRA, the forfeitability of the property must be shown by a preponderance of the evidence. Had Congress wished to enact DoJ's proposal, it would have substituted the words "probable cause" for "adequate evidence . . . to establish the forfeitability of the property."

1 David B. Smith, *Prosecution and Defense of Forfeiture Cases*, ¶ 11.03[6]. The Ninth Circuit has upheld the constitutionality of Section 1615. *United States v. One 1970 Pontiac GTO, 2–Door Hardtop*, 529 F.2d 65, 66 (9th Cir.1976). However, the Ninth Circuit has not decided whether CAFRA would be constitutional if it were construed as allowing a lawsuit to proceed despite the lack of any untainted probable cause for its initiation. Thus, *$191,910.00's* fate was not neatly addressed by CAFRA, and Section 1615's continuing application to narcotics cases appears to be a question of first impression.[14] The better view is that the probable cause requirement survives. There are several reasons for this conclusion.

First, 18 U.S.C. § 981(d) provides that "the provisions of the customs laws relating to the seizure, summary and judicial forfeiture . . . insofar as they are applicable and not inconsistent with the provisions of this section, shall apply to seizures and forfeitures! incurred, or alleged to have been incurred, under this section." It is true that Section 1615 is at least partially inconsistent with Section 983(c)(1)[15]—the former places the *trial*

---

**14.** The parties disagree as to whether *$191,910.00* represented the "majority" or "minority" rule pre-CAFRA. To this Court, that question is academic.

**15.** "[T]he burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).

burden of proof on the claimant, while the latter imposes it on the Government. Obviously, Section 1615 is inapplicable in this regard. However, Section 983(c)(1), and every other CAFRA section, fail to address explicitly the probable cause aspect of Section 1615. The Government responds by arguing that Section 983(c)(1) and Section 1615 are "materially inconsistent" because both set forth completely different standards of proof to be established in different types of forfeiture proceedings. (Gov't Opp. at 13.) By definition, the Government asserts, Section 983(c)(1) completely displaces Section 1615 for purposes of drug forfeiture cases. If true, then CAFRA would represent something of a "wash" for the Government. While CAFRA assigned to the Government the ultimate burden of proof at trial for the first time, it would no longer even need probable cause to institute a forfeiture action. In contrast, UMCC believes that since Section 983(c)(1) only discusses the trial burden of proof, which it imposed on the Government rather than the claimant, Congress lacked any intent to eliminate the probable cause requirement for simply filing a forfeiture action. According to UMCC, if Congress had wanted to eliminate the probable cause threshold for instituting an action, it would have included a provision stating as much. UMCC claims that CAFRA represented a total victory for reformers, and that the Government's position is inconsistent with this reality.

Thus, one's opinion of Section 1615's relationship with Section 983(c)(1) depends on whether he/she takes a "macro" or "micro" perspective of the two provisions. The Government looks broadly at the two sections, observes that the burdens are "different," and concludes that Section 1615 has been entirely superseded in narcotics actions due to CAFRA. UMCC looks closely at the actual issues addressed by Section 983(c)(1), notes that Section 983(c)(1) only makes express reference to a party's trial burden of proof, and concludes that the probable cause requirement of Section 1615 is not inconsistent with CAFRA. Either interpretation is facially reasonable, but the Court agrees with UMCC. Section 981(d) necessarily incorporates Section 1615 to the extent (if at all) that it is not inconsistent with CAFRA's substantive provisions. Section 1615's probable cause requirement is not wholly inconsistent with Section 983(c)(1) because it is literally feasible for both requirements to coexist together in a sensible fashion: there is nothing intrinsically inconsistent with requiring the Government to have probable cause to file a lawsuit (Section 1615) and to have the ultimate burden of proving forfeitability by a preponderance of the evidence at trial (Section 983(c)(1)).

This analysis is equally applicable with respect to Section 983(c)(2) and Section 983(a)(3)(D). Section 983(c)(2) provides that "the Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture." Again, this provision does not contradict Section 1615's probable cause provision. It only states that the Government may use after-acquired evidence to prove forfeitability at trial by a preponderance. It does not detail whether such evidence may be used to demonstrate probable cause for *filing* the action. Section 983(a)(3)(D) similarly states "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." As explained by Mr. Smith, the Government establishes "forfeitability" with proof by a preponderance of the evidence. The probable cause standard involves a lesser threshold, and by itself is insufficient for

the Government to achieve a successful forfeiture. This statutory language does not indicate, as explained by Mr. Smith above, that the Government can proceed with a forfeiture action if it lacks probable cause to initiate it. *See* Smith, *supra,* ¶ 11.03[6] ("Had Congress wished to enact DoJ's proposal, it would have substituted the words 'probable cause' for 'adequate evidence ... to establish the forfeitability of the property.' ") Rather, this provision simply allows the Government the opportunity to conduct discovery to meet its preponderance burden, assuming it at least has the minimal untainted probable cause necessary to commence the lawsuit.

Because the Section 1615 probable cause provision has not been contradicted by CAFRA, the Court hereby holds that it has been incorporated into the new civil asset forfeiture regime via Section 981(d).[16] This view is further supported by reference to a proposed reform bill that was submitted in 1997, but never enacted. At Section 2, this bill similarly shifted the preponderance of the evidence burden from the claimant to the Government. Importantly, Section 13 would have amended Section 981(d) and expressly repealed the Section 1615's probable cause proviso as follows:

> Title 18, United States Code.-Section 981(d) of Title 18, United States Code, is amended by inserting after the first sentence the following: "However, the Cost Bond Provision of Section 608 of the Tariff Act of 1930 (19 U.S.C. 1608) and the burden of proof provision of Section 615 of the Tariff Act of 1930 (19 U.S.C.

> 1615) shall not apply to any forfeiture governed by the procedures set forth in this chapter."

1997 H.R.1965; 105 H.R.1965 (Lexis citation). In contrast, CAFRA left Section 981(d) untouched, and with no reference to Section 1615. This omission buttresses the conclusion that the Government must still have untainted probable cause to file a forfeiture complaint.

Second, Congress' intent is further reflected in its legislative history. Chairman Henry J. Hyde made the following crucial statement regarding CAFRA: "while the government may use evidence obtained after the forfeiture complaint is filed to establish the forfeitability of the property by a preponderance of the evidence, the government must still have had enough evidence to establish probable cause at the time of filing (or seizure, if earlier)." 146 Cong. Rec. H 2050 (Apr. 11, 2000).

Third, to the extent that there is any uncertainty regarding Section 981(d)'s incorporation of the probable cause standard, the *$191,910.00* Court requires that the issue be resolved in favor of the claimant. In *$191,910.00,* the Ninth Circuit held that "forfeiture statutes are strictly construed against the government. There are good reasons for this rule. Government confiscation of private property is disfavored in our constitutional system." 16 F.3d at 1068 (citing *United States v. One 1936 Model Ford V–8 DeLuxe Coach,* 307 U.S. 219, 226, 59 S.Ct. 861, 83 L.Ed. 1249 (1939)).

---

**16.** Other portions of the Customs law have been incorporated into CAFRA via Section 981(d). *See, e.g., United States v. Real Property Located at 11211 East Arabian Park Drive,* 379 F.Supp.2d 1058, 1062 n. 1 (D.Ariz.2005) (incorporating Section 1606). The Government cites to 18 U.S.C. § 983(i)(2)(A), which lists certain categories of proceedings that are wholly exempt from CAFRA. However, the

fact that CAFRA's reach is limited does not mean that other laws, such as those defined by the Customs law under Title 19, are themselves excluded from CAFRA's application. In fact, such a result would conflict with other statutory clauses expressly incorporating consistent Customs provisions. *See* 18 U.S.C. § 981(d); 21 U.S.C. § 881(d).

Fourth, the Court believes that this interpretation is necessary to avoid substantial constitutional concerns that would emerge if Section 1615's probable cause requirement is eviscerated. *See United States v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 655 n. 16 (3d Cir.2002) ("This view avoids the obvious questions of fundamental fairness that would rise from the government attempting to have a court order forfeiture without first having an adequate factual basis to support the request."). If the Government's theory is correct, it would have the power to do the following on a systematic scale: (1) engage in searches and seizures without probable cause, (2) institute forfeiture actions, and (3) use the discovery processes of federal court to identify evidence of forfeitability that it utterly lacked in the first place. *See $191,910.00*, 16 F.3d at 1067 ("Without such a rule, government agents might be tempted to bring proceedings (and thereby seize property) on the basis of mere suspicion or even enmity and then engage in a fishing expedition to discover whether probable cause exists.").

The Court recognizes that a claimant could still move to suppress the fruits of an illegal search, as UMCC successfully did in this case. However, the Government's position would permit it to subsequently obtain other evidence of forfeitability through civil discovery in the federal courts despite the absence of probable cause.

■ CAFRA should be interpreted, as reasonably permitted, in order to avoid any threat of constitutional invalidation. *Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1568 (9th Cir.1993) ("[C]ourts are obliged to impose a saving interpretation of an otherwise unconstitutional statute so long as it is 'fairly possible to interpret the statute in a manner that renders it constitutionally valid.' ") (quoting *Communications Workers of Am. v. Beck*, 487 U.S.

735, 762, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988)). Therefore, Section 1615's probable cause requirement has survived CAFRA's enactment.

### 2. Pleading Civil Forfeiture Actions

The Government's opposition brief appears to confuse rules of pleading, as evaluated on a motion to dismiss, with evidentiary showings required on a motion for summary judgment. It would therefore be useful to harmonize the forfeiture pleading rules with the continuing vitality of Section 1615 on a motion for summary judgment.

Civil asset forfeiture cases are governed by special pleading rules. Supplemental Rule G, which became effective December 1, 2006, "governs a forfeiture action in rem arising from a federal statute. To the extent that this rule does not address an issue, Supplemental Rules C and E and the Federal Rules of Civil Procedure also apply." Admiralty and Maritime Claims Supp. R. G(1). Prior to this date, Supplemental Rule E(2)(a) provided that "[i]n actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."

■ As of this date, Supplemental Rule G(2)(f) is operative, which requires that the Government "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f) codifies the same pleading requirement that has been divined from Rule E(2)(a), except with different language. The Advisory Committee Note offers the following clarification:

Rule E(2)(a) requires that the complaint in an admiralty action "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Application of this standard to civil forfeiture actions has evolved to the standard stated in subdivision (2)(f). The complaint must state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial. *See U.S. v. Mondragon,* 313 F.3d 862 (4th Cir.2002). Subdivision (2)(f) carries this forfeiture case law forward without change.

The Court concurs with the Government that regardless of the applicable supplemental rule (Rule E(2)(a) or G(2)(f)), they "do[ ] not require the government to meet, at the pleading stage, its ultimate trial burden...." *United States v. $150,660.00 in U.S. Currency,* 980 F.2d 1200, 1204–05 (8th Cir.1992) (discussing Rule E(2)(a)). Yet, this is not the end of the story.

■ While CAFRA changed the Government's burden of proof, it did not address the rules of pleadings (as governed by the Supplemental Rules). The Government argues that notice pleading is all that is required of it under either Rule E(2)(a) or G(2)(f). This is incorrect. Post–CAFRA, the Fourth Circuit has considered CAFRA's impact on the Government's pleading responsibilities. In *Mondragon,* the Court noted that "[t]he pleading requirement of a 'reasonable belief' that probable cause can be shown at trial' was apparently keyed to the government's burden of proof at the time (prior to 2000)." 313 F.3d at 865 (quoting *United States v. Daccarett,* 6 F.3d 37, 47 (2d Cir.1993)). The Court explained that "[i]n light of CAFRA's change in the burden of proof, it is a bit awkward to say now that Rule E(2)(a) requires the complaint to allege facts sufficient to support a reasonable belief that the government can establish probable cause for forfeiture at trial." *Id.* Thus, Rule E(2)(a) was interpreted to require the Government to "allege facts sufficient to support a reasonable belief that the property is subject to forfeiture." *Id.* at 865–66. Since *Mondragon's* standard for Rule E(2)(a) has been incorporated expressly into Rule G(2)(f), the Court cannot agree with the Government's assertion that the latter formulation somehow requires less of the Government than the former.[17]

17. To the extent that *United States v. Lopez–Burgos,* 435 F.3d 1, 2 (1st Cir.2006), and *United States v. $200,255.00 in U.S. Currency,* 2006 WL 1687774, at *9 (M.D.Ga. June 16, 2006), suggest that a lower pleading standard than *Mondragon* is permitted, that position was invalidated by Rule G(2)(f)'s enactment and the accompanying advisory committee note. The Government's citation to *United States v. $3,294.00 in U.S. Currency,* 2006 WL 1982852, at *4 (D.Utah July 13, 2006) ("It is clear that the government need not establish forfeitability of the property until trial, and therefore dismissal based on lack of probable cause is not proper."), is unpersuasive because it does not refer to Section 1615, CAFRA's legislative history, or *Mondragon.* Finally, as explained by UMCC, the Government's other citation actually supports UMCC's position to a degree. *See United States v. $78,850.00 in U.S. Currency,* 444 F.Supp.2d 630, 638 n. 11 (D.S.C.2006) ("The claimants point out that although CAFRA permits the government to use after-acquired evidence to establish the forfeitability of seized property, CAFRA does not permit the government to use after-acquired evidence to establish probable cause to initially seize the property because such an interpretation of CAFRA would run afoul of the Fourth Amendment. The court agrees with the claimants."). Of course, this decision is only of limited value since it discusses whether there was probable cause to *seize* an item, not whether there was probable cause subsequently to *file a forfeiture action.*

These historical developments have been detailed for a purpose. *Mondragon's* interpretation of Rule E(2)(a), and the subsequently enacted Rule G(2)(f), require that the Government allege facts that would "support a reasonable belief that the government will be able to meet its burden of proof at trial." As has been discussed at length, the Government's "burden of proof at trial" post-CAFRA is to establish forfeitability by a preponderance of the evidence.

The fact that the Government must no longer specifically plead in the language of "probable cause" does not mean either that: (1) the pleading requirements have lessened since CAFRA, or (2) the Section 1615 *evidentiary* requirement of initiating a lawsuit with probable cause has vanished. The Government's pleading of probable cause is not relevant to whether, on a motion for summary judgment, it actually *had* probable cause to file the forfeiture action. *See $191,910.00*, 16 F.3d at 1068 ("Under section 1615, the government must have probable cause at the time it institutes forfeiture proceedings, not merely plead probable cause.").

An analogy to the statute of limitations defense in a common law contracts case is illustrative. In such a case, the plaintiff need only plead sufficient facts to demonstrate that it is entitled to prevail based on the prima facie elements of the claim (e.g., was there a valid contract?; did plaintiff perform?; did defendant breach?; were there damages?). The plaintiff is generally under no obligation to plead around every affirmative defense that might potentially be lurking in the background. Although the plaintiff is not required to plead that his/her lawsuit has been brought within the statute of limitations, the defendant may still ultimately prove by evidence on summary judgment that the lawsuit was untimely. The same applies to this case. Even assuming *arguendo* that the Government has been "alleviated" of the burden of pleading probable cause to initiate the lawsuit, this does not bar UMCC from prevailing with evidence on a motion for summary judgment that the Government actually lacked untainted probable cause. It is not the rules of pleading that decide the elements of a cause of action and available defenses, but the statutory provisions themselves.

Ultimately, *Mondragon* and Rule G(2)(f) have instituted a semantic, as opposed to a substantive, change to the pre-CAFRA pleading standards. These rules do not constrain UMCC's ability to prevail on a motion for summary judgment based on Section 1615.

### C. Whether the Government had Probable Cause on the Filing Date

■ Since the material facts are undisputed, this Court must decide whether the federal Government had "probable cause" to initiate the lawsuit on September 12, 2005. As detailed in criminal procedure cases, the Court must answer this question with reference to any *untainted* evidence in the Government's possession. *See United States v. Driver*, 776 F.2d 807, 812 (9th Cir.1985) ("We need only determine that the search warrant was issued upon probable cause as supported by the facts 'untainted' by the prior illegality."); *see also United States v. Giordano*, 416 U.S. 505, 555, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., concurring & dissenting) ("The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.").

■ To establish probable cause, "[t]he government must show that it had reasonable grounds to believe a connection

existed between the property and drug activities, supported by more than mere suspicion but less than prima facie proof." *United States v. $42,500.00 in U.S. Currency*, 283 F.3d 977, 980 (9th Cir.2002); *see also United States v. $506,231*, 125 F.3d 442, 451 (7th Cir.1997) (noting that there must be some "nexus between the seized property and illegal narcotics activity"). Since the search warrant was suppressed, the Government cannot rely on the evidence it seized on March 15, 2005, including the currency itself, to establish the currency's alleged connection to federal narcotics violations. The Government states that "there is no evidence whatsoever suggesting that the defendant currency is tied to anything other than UMCC's marijuana sales activity." (Gov't Opp. at 18.) Yet, this observation misses the mark because it is the Government that must proffer untainted evidence connecting the currency to the illegal activity. It is not UMCC's burden to demonstrate the absence of a connection.

The remaining Government "evidence" can be categorized as follows: (1) observations of the LAPD officers and voluntary statements made by UMCC employees prior to the search, (2) Judge Sandvig's August 26, 2005, order releasing the defendant currency to the United States Marshals, and (3) Scott Feil's state court declaration (as well as statements made in the related motions and briefs filed by UMCC's attorneys in that venue). First,

the LAPD observations of the UMCC facility, including the individuals leaving with brown paper bags and statements from Jaramillo, all confirm that UMCC was in the business of selling marijuana. However, these statements make no reference to the defendant currency, and thus do not create the requisite "connection" between the defendant and drug activity. Second, Judge Sandvig signed a one-page order on August 26, 2005, presented to him by a DEA agent, which released the defendant currency to the federal Government. (Biczo Decl. ¶ 5 & Ex. F.) The Order only makes two "factual" statements: (1) that the LAPD believed there was "probable cause" to forfeit the currency under federal law, and (2) the currency was obtained via the state court search warrant on March 15, 2005. This order also fails to assist the Government. The fact that the LAPD subjectively believed that there was probable cause is irrelevant to whether such probable cause actually existed.

■ Therefore, UMCC's motion will rise or fall depending on the admissibility or "taint" relating to the Feil state court declaration filed in support of the "motion for return of property illegally seized." If the declaration is untainted and otherwise admissible, the Government would have probable cause for filing the lawsuit. Feil admits in his declaration that the defendant currency was connected to UMCC's medical marijuana sales, for which there is no exception under federal law.[18] UMCC

---

18. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 491, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) ("[A] medical necessity exception for marijuana is at odds with the terms of the Controlled Substances Act. The statute, to be sure, does not explicitly abrogate the defense. But its provisions leave no doubt that the defense is unavailable."); *Freightliner, LLC v. Teamsters Local 305*, 336 F.Supp.2d 1118, 1121 (D.Or.2004) ("[F]ederal drug laws provide no exception for medical marijuana."); *cf. Raich v. Gonzales*, 500 F.3d 850, 865–66 (9th Cir.2007) ( "[F]ederal

law does not recognize a fundamental right to use medical marijuana prescribed by a licensed physician...."). UMCC has previously cited to the Ninth Circuit's 2003 decision in *Raich v. Ashcroft*, 352 F.3d 1222 (9th Cir. 2003), *rev'd by, Gonzales v. Raich*, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005), claiming that because this decision was the "law of the Ninth Circuit" as of March 15, 2005, the LAPD lacked probable cause under federal law for a search warrant. First, the Court believes that UMCC has misconstrued the 2003 decision since: (1) the *Raich* plaintiffs'

offers several arguments as to why Feil's declaration cannot be considered by this Court.

### 1. Judicial Estoppel

■ UMCC argues that the Government is judicially estopped from relying on the Feil declaration. Since judicial estoppel "is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion." *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990). " 'Equitable' in this context refers more to fairness and discretion than to the technical distinction between law and equity." *In re An–Tze Cheng,* 308 B.R. 448, 459 (9th Cir.BAP 2004).

The Ninth Circuit has detailed judicial estoppel's purpose: "[t]he doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent posi-

tions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process." *Russell,* 893 F.2d at 1037 (quoting *Religious Tech. Ctr. v. Scott,* 869 F.2d 1306, 1311 (9th Cir.1989) (Hall, J., dissenting)); *see also Stevens Tech. Servs., Inc. v. S.S. Brooklyn,* 885 F.2d 584, 588 (9th Cir.1989) ("Judicial estoppel precludes a party from asserting a position in a current legal proceeding which is contrary to the position that party previously asserted in another.").

The Supreme Court has recently established the basic parameters of judicial estoppel. *See New Hampshire v. Maine,* 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). There are three factors that the Court explicitly delineated as relevant in *New Hampshire :* 1) whether Plaintiff's

activities—"the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes"—were far less likely to have an impact on interstate commerce than UMCC's; and (2) the *Raich* panel only determined that the Controlled Substances Act was "likely unconstitutional" as applied to the facts of that case, and never held that the statute was actually unconstitutional. *Id.* at 1228, 1234. More importantly, the Supreme Court has made it eminently clear that the state of Ninth Circuit law, as of March 15, 2005, is irrelevant to this Court's probable cause determination. Under *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), "[w]hen th[e] [Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." This rule applies in both civil and criminal cases. *See id.; see also Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Therefore, the Court's probable cause analysis must be based on *currently* applicable principles of federal law. And despite the district court's decision in *United States v. Real Property Lo-*

*cated at 11550 Mushroom Trail,* 2006 WL 191935 (E.D.Cal. Jan. 19, 2006), the Ex Post Facto Clause has never been applied to civil forfeitures in the Ninth Circuit. *See United States v. $5,644,540.00 in U.S. Currency,* 799 F.2d 1357, 1364 n. 8 (9th Cir.1986) ("The *ex post facto* clause, however, applies only to criminal cases and we are dealing with a civil forfeiture.") (internal citation omitted). It is true that the *$5,644,540.00* holding was questioned in *United States v. $814,254.76, in U.S. Currency,* 51 F.3d 207 (9th Cir.1995), as a result of a subsequent Supreme Court decision. *Id.* at 211 n. 6 ("[W]e need not decide the continuing validity of [$5,644,540] in this case."). But as discussed in detail below, *infra* Part III.C.2.a, the *Austin* case should be read narrowly and has been limited to its particular facts. In this Court's view, *Austin* does not create an ex *post facto* concern where none existed before in civil forfeiture law, especially because of the Supreme Court's post-*Austin* decision in *Ursery. See United States v. Certain Funds,* 96 F.3d 20, 27 (2d Cir.1996) ("We now conclude, on the basis of the analysis in *Ursery,* that … 21 U.S.C. § 881(a)(6) [is] not penal for purposes of the Ex Post Facto Clause."). Like *Austin, Ursery* is also analyzed in Part III.C.2.a. The district court in *11550 Mushroom Trail* failed to address this point.

prior position was "clearly inconsistent" with its current position, 2) "whether the party has succeeded in persuading a court to accept that party's earlier position," and 3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51, 121 S.Ct. 1808.

UMCC asserts that judicial estoppel should apply to the Feil declaration because the LAPD concealed the fact that the forfeiture would proceed in federal court as opposed to state court. Based on this misunderstanding, the Government in this case is now trying to obtain the benefit of a futile declaration, which UMCC filed despite the fact that the currency had apparently been transferred to the DEA at an earlier date. Therefore, UMCC concludes that the Government should not have the benefit of the Feil declaration.

 The Court disagrees. Judicial estoppel generally applies only where a *court* relies on and accepts a party's past position. UMCC's reply brief focuses nearly exclusively on its own reliance, which is not pertinent to the analysis. UMCC has not provided: (1) any communication by state government actors (*e.g.*, the LAPD) that they intended to proceed in state court, or (2) how any such statement was accepted by the state court. For example, it does not appear that state civil forfeiture proceedings had been initiated, but were thwarted by the currency's release to the federal government. The motion for the return of illegally seized property does not list a case number in its caption. (Biczo Decl. Ex. E at 76.) UMCC may have merely assumed that the forfeiture would proceed in state court because the currency was originally held in that jurisdiction, and consequently filed the motion for the return of property in that venue.

UMCC's argument also fails because the plaintiff in this case is the *federal* Government, while the actions complained of were committed by state government officials. Although there appears to be some unity of economic interest in the outcome of this forfeiture action, the Court cannot accept without greater support that the Government should be judicially estopped by the LAPD's actions.

In its discretion, the Court declines to apply the doctrine of judicial estoppel to the Feil declaration. UMCC has failed to demonstrate that the Government's prior position is "clearly inconsistent," or how any state or federal court was persuaded by and relied on it.

### 2. Simmons

UMCC next argues that the Feil declaration is immune from Government exploitation. In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court fashioned a doctrine that is sometimes referred to as "judicial use immunity." Its application usually arises in the context of a criminal case, where the defendant desires to have certain evidence suppressed prior to trial as a result of a Fourth Amendment transgression. The problem that such a defendant encounters is that in order to establish standing for purposes of arguing that the disputed evidence should be suppressed, he/she may risk waiving the Fifth Amendment right against self-incrimination. The Supreme Court attempted to resolve this tension between constitutional rights:

> [I]n this case [defendant] was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that

one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

*Id.* at 394, 88 S.Ct. 967. UMCC argues that Feil's state court declaration, made to establish "standing" for purposes of having its property returned, should be afforded *Simmons* immunity in this action.

Although the *Simmons* doctrine has been discussed repeatedly, the parties have not explained in any depth why the Self–Incrimination Clause can be invoked at all. Clearly, the "intolerable choice" between the Self–Incrimination Clause and some other constitutional right can only be a concern if the Self–Incrimination Clause is applicable to this lawsuit. This Court can identify two possible focal points to which the Self–Incrimination Clause could theoretically attach: (1) this civil forfeiture proceeding, or (2) the state court motion for the return of illegally seized property.[19] If the Fifth Amendment's reach is absent from both, then the *Simmons* policy rationale vanishes.

#### a. The Civil Forfeiture Proceeding

In *United States v. Cretacci,* 62 F.3d 307 (9th Cir.1995), the Ninth Circuit held that:

A defendant's claim of ownership at a pre-trial suppression hearing of property that he contends was unlawfully seized may not be used to prove the

defendant's guilt. For the same reason, a defendant's claim of ownership of property that was subject to forfeiture may not be used for that purpose. *Id.* at 311. While this language might support UMCC's position, *Cretacci's* reach is unclear. First, a subsequent decision in the Ninth Circuit has taken pains to point out that this discussion regarding forfeiture claims constitutes dicta. *See United States v. Scrivner,* 189 F.3d 825, 828 (9th Cir.1999) ("The discussion about the admissibility of the claim of ownership was in response to a hypothetical argument and was therefore dicta."). Second, although *Cretacci* could allow a *criminal* defendant to avoid the impact of an admission of ownership made in a related civil forfeiture case, it is not at all clear why a similar benefit should accrue to a claimant in a civil forfeiture proceeding. *Cf.* 6 Wayne R. LaFave, *Search and Seizure,* § 11.2 n. 171 ("*Simmons* has no application at a hearing on a motion for return of seized property, as that is a civil proceeding."). For the sake of argument, the Court will proceed with the analysis on the basis that it is at least possible for a claimant to invoke "judicial use immunity" in response to prior statements of ownership made in non-criminal proceedings (*e.g.,* the state court Feil declaration). The Court must therefore determine whether the Self–Incrimination Clause applies to this forfeiture action.[20] If it does not apply, as stated before, *Simmons'* feared "intolerable choice" of selecting

**19.** While UMCC also filed a motion to set aside the release of the currency to the federal government, it could not be entitled to any greater Fifth Amendment protection than the motion for the return of illegally seized property.

**20.** Some, but not all, constitutional protections have been incorporated into the civil

forfeiture landscape. *See United States v. One 1985 Mercedes,* 917 F.2d 415, 419 (9th Cir. 1990) ("Because of the use of civil forfeiture statutes to aid in the enforcement of criminal laws, courts have developed limited constitutional criminal law protections for owner-claimants.") (citations omitted).

between constitutional rights would be absent.

■ Two Ninth Circuit cases from the early 1990s might suggest that the Self-incrimination Clause applies to all civil forfeiture actions. For example, in *United States v. $84,740.00*, 981 F.2d 1110, 1114 (9th Cir.1992), the Ninth Circuit noted that there are at least "two criminal law protections which apply in civil forfeitures: the Fourth Amendment exclusionary rule and the Fifth Amendment protection from self-incrimination." *See also One 1985 Mercedes*, 917 F.2d at 419 (same). Since then, the Self–Incrimination Clause's applicability in civil forfeiture actions has been limited by the Supreme Court. One reason for this outcome is that the Fifth Amendment's Self-incrimination Clause is textually directed to criminal cases, while the Fourth Amendment is not.[21] *Compare* U.S. Const. amend. V ("[N]or shall [an individual] be compelled in any criminal case to be a witness against himself"), *with* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). Thus, the Supreme Court has recognized that "the Fifth Amendment's Self–Incrimination Clause, which is textually limited to 'criminal case[s],' has been applied in civil forfeiture proceedings, but only where the forfeiture statute had made the culpability of the owner relevant, or where the owner faced the possibility of subsequent criminal proceedings." *Austin v. United States*, 509 U.S. 602, 608 n. 4, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (internal citations omitted).

This leads the Court to ask whether this lawsuit, which has been brought under 21 U.S.C. § 881(a)(6)[22], meets either exception. The first exception refers to "culpability." Ordinarily, culpability speaks directly to the divide between criminal and civil forfeiture actions. As summarized by the Ninth Circuit:

> The classical distinction between civil and criminal forfeiture was founded upon whether the penalty assessed was against the person or against the thing. Forfeiture against the person operated *in personam* and required a conviction before the property could be wrested from the defendant. Such forfeitures were regarded as criminal in nature because they were penal; they primarily sought to punish. Forfeiture against the thing was *in rem* and the forfeiture was based upon the unlawful use of the *res*, irrespective of its owner's culpability. These forfeitures were regarded as civil; their purpose was remedial.

*United States v. Seifuddin*, 820 F.2d 1074, 1076–77 (9th Cir.1987) (internal citations omitted). However, *Austin* itself recognized that in some instances a civil forfei-

---

21. Mr. Smith, UMCC's co-counsel, has himself questioned the rationale for the Self-incrimination Clause's extension into civil forfeiture actions. 1 Smith, *supra*, § 10.03[1] ("Extending the Fifth Amendment privilege to civil forfeiture cases in general is ... anomalous in view of the textual limitation of the Self–Incrimination Clause to criminal cases.").

22. 21 U.S.C. § 881(a)(6) permits the United States to forfeit "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this [subchapter], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this [subchapter]."

ture action could be based in significant part on a claimant's culpability, which in turn would make the resulting civil forfeiture a punitive act. *See United States v. $734,578.82 in United States Currency,* 286 F.3d 641, 657 n. 21 (3d Cir.2002) ("[C]ertain kinds of civil forfeitures can indeed be punitive."). Where a civil forfeiture case retains this criminal-like quality, there is greater reason for extending the Self-incrimination Clause's scope beyond the strict confines of criminal cases.

The culpability analysis must begin with *Austin.* Although *Austin* limited the Self–Incrimination Clause's reach in civil forfeiture cases to two circumstances, the *Austin* Court also imparted a potentially broad understanding of the term "culpability." Prior to CAFRA, 21 U.S.C. §§ 881(a)(4), (a)(6), and (a)(7), were each subject to an innocent owner defense. 1 Smith, *supra,* § 4.03[4][c]. *Austin* centered on whether the Eighth Amendment's Excessive Fines clause applies to civil forfeiture actions brought under Sections 881(a)(4) and (a)(7). The Court concluded that the clause applied, in part, because the innocent owner defense revealed an intent by Congress to punish drug offenders. *Austin,* 509 U.S. at 619, 113 S.Ct. 2801. The majority reached its determination with the notion of culpability at the forefront of its analysis:

> In light of the historical understanding of forfeiture as punishment, the clear focus of §§ 881(a)(4) and (a)(7) on the culpability of the owner, and the evidence that Congress understood those provisions as serving to deter and to punish, we cannot conclude that forfeiture under [these sections] serves solely a remedial purpose.

*Id.* at 621–22, 113 S.Ct. 2801. In his concurrence, Justice Scalia accused the majority of engaging in a "misleading discussion of culpability." *Id.* at 626, 113 S.Ct. 2801 (Scalia, J., concurring).

Because Section 881(a)(6) also contained an innocent owner defense, it would be logical to conclude that the instant lawsuit is punitive. *See United States v. Baird,* 63 F.3d 1213, 1221 (3d Cir.1995) ("[L]ike the sections of the forfeiture statute at issue in *Austin,* § 881(a)(6) also includes an innocent owner defense, which focuses on the culpability of the owner in a way that makes it look more like punishment. Section 881(a)(6)'s conditioning of forfeiture on a violation of the Controlled Substances Act is also indicative of Congress' punitive intent.") (citations omitted). Based on the "culpability" analysis that inheres in Section 881(a)(6), it would be reasonable to infer that the Self–Incrimination Clause is part of the calculus in this civil forfeiture action. In that event, it would be possible for UMCC to argue that *Simmons* bars this Court from considering the Feil Declaration.

Yet, *Austin's* culpability analysis has not been extended beyond the Excessive Fines context. In *United States v. Ursery,* 518 U.S. 267, 272, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), the Supreme Court rejected the argument that "forfeitures under … [Section] 881(a)(6) always constitute 'punishment.'" In refusing to extend the protections of the Double Jeopardy Clause to civil forfeiture actions under this section, the Supreme Court emphasized: (1) that there "is little doubt that Congress intended these forfeitures [Sections 881(a)(6) and (a)(7)] to be civil proceedings"; (2) the forfeiture proceedings are not "so punitive in form and effect as to render them criminal despite Congress' intent to the contrary"; and (3) while these statutes "perhaps hav[e] certain punitive aspects, [they] serve important nonpunitive goals." *Id.* at 288–90, 116 S.Ct. 2135. *Ursery's* discussion regarding congressional intent and the non-punitive aspects of Section 881 stands in sharp contrast to *Austin's* analysis.

In light of *Ursery,* courts have recognized that *Austin's* discussion of culpability in regard to Section 881 crimes should be limited to the narrow context of the Excessive Fines Clause. *See United States v. $129,727.00 in United States Currency,* 129 F.3d 486, 494 (9th Cir.1997) ("Where the Supreme Court has emphasized the civil nature of forfeitures under § 881(a) and indicated its intention to limit *Austin* ... to [its] facts, this court will not reach a contrary result.") [23]; *see also United States v. Parcel of Property,* 337 F.3d 225, 232 (2d Cir.2003) ("The *Ursery* court also limited *Austin's* holding that civil forfeitures are 'punishment' to the context of the Excessive Fines Clause of the Eighth Amendment."); *United States v. Two Parcels of Real Property,* 92 F.3d 1123, 1129 (11th Cir.1996) (same).

For purposes of this case, the most relevant analysis subsequent to *Ursery* comes from the Eighth Circuit, which held that "[i]n rem forfeitures under [Section] 881 are not predicated on the culpability of any defendant, and there is no evidence that [the claimant] faces any criminal proceedings related to this incident. Accordingly, this is a civil action for purposes of the Fifth Amendment's Self–Incrimination Clause." *United States v. $141,770.00 in United States Currency,* 157 F.3d 600, 607 n. 5 (8th Cir.1998); *see also Two Parcels of Real Property,* 92 F.3d at 1129 ("The claimants had a right to assert the Fifth Amendment privilege in this civil forfeiture proceeding. This Court has held, however, that the trier of fact may take an adverse inference against the parties to a civil action refusing to testify on Fifth Amendment grounds.") (internal citations omitted). In regards to the second *Austin* exception—possibility of subsequent criminal proceedings—*$141,770.00* (as quoted

*supra* ) also clarifies that it will only apply where there is some evidence that the claimant is likely to face criminal charges.

 Despite possible hints from the Ninth Circuit in the early 1990s that the Self–Incrimination Clause extends into every civil forfeiture action, the Court is persuaded by the Eighth Circuit's reasoning due to the combined effect of *Austin* and *Ursery.* The Self–Incrimination Clause is simply inapplicable to this action because Section 881(a)(6) does not sufficiently involve the punishment of culpable conduct, and there is no evidence suggesting that UMCC will face any criminal proceedings related to this incident. If *Simmons* is to have any relevance in this case, the Self-incrimination Clause's application must originate from the state court motion itself.

### b. The Motion to Return Illegally Seized Property

 Accepting for present purposes that the Self–Incrimination Clause does not apply in a Section 881 civil forfeiture proceeding, the Court must determine whether the right somehow instead attaches to the state court motion for the return of illegally seized property. This motion was filed in state superior court on May 17, 2005. (Biczo Decl. Ex. E at 76.)

UMCC claims that this motion was made "under the compulsion of state law, (Cal. H & S § 11488.4(g)) that required Mr. Feil to establish UMCC's standing to obtain return of its illegally seized property reasonably believed to be in state court...." (Cl. Reply at 13.) UMCC complains that the "outcome seriously sought by the [G]overnment here is based upon the Hobson's choice between foregoing UMCC's right to the return of its illegally seized property, thereby abandoning it to

23. Prior to *Austin* and *Ursery,* the Ninth Circuit also held that "because [Section] 881 is primarily civil in nature, the abatement doctrine does not apply to the forfeiture proceeding in this case." *$84,740.00,* 981 F.2d at 1113.

the LAPD, and admitting its statutorily compelled ownership ...." (*Id.* at 15.) UMCC also hints that this motion contains evidence that would not be admissible in an underlying or related criminal offense under California Health & Safety Code § 11488.5(c)(1). (*Id.* at 14.)

Yet, it is not clear to this Court whether UMCC's description of state law is accurate. Under Section 11488.4(a), the state Attorney General or local district attorney has one year from the date of seizure to file a petition for forfeiture. Once the petition is filed, notice of the seizure and a copy of the petition are to be served "upon every individual designated in a receipt issued for the property seized." Cal. Health & Safety Code § 11488.4(c). Additionally, "[w]hen a forfeiture action is filed, the notices [of seizure] shall be published once a week for three successive weeks in a newspaper of general circulation in the county where the seizure was made or where the property subject to forfeiture is located." *Id.* § 11488.4(e). At that point, interested parties generally have thirty days to file a verified claim "stating his or her interest in the property." *Id.* § 11488.5(a)(1). It is this "verified claim," or a claim made pursuant Section 11488.4(j), that are specifically immunized from use in a related state criminal prosecution. *Id.* § 11488.5(c)(1).

UMCC's motion was not filed as a "verified claim" under Section 11488.5(a)(1) or 11488.4(j). Instead, UMCC's motion is concededly governed by Section 11488.4(g). Section 11488.4(g) states that "[n]othing contained in this chapter shall preclude a person, other than a defendant, claiming an interest in property actually seized from moving for a return of property if that person can show standing by proving an interest in the property not assigned subsequent to the seizure or filing of the forfeiture petition." Since the state immunity provision of Section 11488.5(c)(1) only

applies to Sections 11488.5(a)(1) and 11488.4(j) on its face, and not Section 11488.4(g), the Court disagrees with UMCC that its motion would be afforded any such protection under state law.

But even if some form of *state* immunity applies to UMCC's state court motion, it is irrelevant to the Fifth Amendment's analysis. UMCC could not plausibly suggest that the Self-incrimination Clause must have an enhanced application in a federal lawsuit as a result of a state court rule regarding state court criminal prosecutions. While state constitutional and statutory protections can certainly go beyond the "floor" set by the federal Constitution, the former cannot increase the scope of the latter.

UMCC's Section 14488.4(g) state court motion is analogous to a federal motion to return illegally seized property under Rule 41(g). Rule 41(g) provides that:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed.R.Crim.P. 41(g). In order to decide whether the Self–Incrimination Clause applies to UMCC's Section 11488.4(g) motion, it is helpful to evaluate whether the clause has been applied to statements made in a Rule 41(g) motion.

There do not appear to be many, if any, decisions directly on point. However, Judge Easterbrook of the Seventh Circuit considered a closely related question in *United States v. Taylor*, 975 F.2d 402 (7th Cir.1992). More than a year after Taylor

pled guilty to armed bank robbery, he replied to the Government's motion to destroy his handgun with a demand that it be returned to him.[24] *Id.* at 402. The district court construed this reply as a motion for the return of property, which was then codified at Rule 41(e), and the Seventh Circuit held that the appeal was "civil" in nature. *Id.* at 402–03.

■ In discussing the merits, Judge Easterbrook summarized the evidentiary hearing held before the magistrate judge. During this hearing, the defendant refused to call any witnesses or testify himself "for fear that the government would prosecute him for being a felon in possession of a weapon. He asked the magistrate judge to treat him as the owner despite the lack of evidence. The magistrate judge declined, a position with which the district court agreed." *Id.* at 403. Judge Easterbrook continued as follows, in pertinent part:

> Because an admission of ownership would strengthen the prosecutor's case of possession, however, Taylor has a privilege not to be compelled to give such testimony. The privilege deals only with *compulsory* self-incrimination. The fifth amendment provides that a person 'shall [not] be compelled in any criminal case to be a witness against himself.' The prosecutor did not compel Taylor to give evidence against himself. He was free to remain silent, and did. Silence has consequences under Rule 41(e), just as in the criminal trial, because silence is no evidence. No evidence that Taylor owned the gun meant that the United States could melt the weapon without subverting Taylor's rights.
>
> What Taylor must have wanted is a form of immunity paralleling that established in *Simmons* .... *Simmons* holds

that a defendant who contends that the police seized evidence in violation of the fourth amendment may establish standing—that is, may present evidence that the search or seizure invaded his privacy or possessory interests—without fear that the evidence will be used against him at trial. Any other approach, the Court thought, would prevent enforcement of the exclusionary rule. Efforts to extend the scope of *Simmons* have not fared well. The Court has declined to use *Simmons* to relieve a litigant in civil litigation of the need to establish elements on which he bears a burden of production or persuasion. A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence. Indeed, the Court has held, the tribunal may draw an adverse inference against a civil litigant who asserts the privilege.

*Id.* at 404 (citations omitted). *Taylor* demonstrates that *Simmons* and the Self-incrimination Clause will confer no benefit on an individual or entity who files a motion for the return of illegally seized property. *See* 6 LaFave, *supra*, § 11.2 n. 171 ("*Simmons* has no application at a hearing on a motion for return of seized property, as that is a civil proceeding."). In this case, UMCC submitted the Feil declaration in order to establish its ownership rights to the defendant currency. Whether one remains silent as in *Taylor*, or speaks out as UMCC did, the Self–Incrimination Clause does not extend to a motion for the return of illegally seized property.

### c. Corporations and the Self–Incrimination Clause

■ There is also a third reason why the *Simmons* argument must fail. The Self-incrimination Clause of the Fifth Amendment does not apply to corpora-

---

**24.** Taylor did not seemingly suggest, as far as the Court can glean, that the weapon was seized in violation of the Constitution or Rule 41.

tions. *See Doe v. United States*, 487 U.S. 201, 206, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988) ("There also is no question that the foreign banks cannot invoke the Fifth Amendment in declining to produce the documents; the privilege does not extend to such artificial entities."); *Braswell v. United States*, 487 U.S. 99, 102, 108 S.Ct. 2284, 101 L.Ed.2d 98 ("[P]etitioner asserts no self-incrimination claim on behalf of the corporations; it is well established that such artificial entities are not protected by the Fifth Amendment."); *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 617 (9th Cir.1973) ("Insofar as the Company is concerned, the privilege against self-incrimination does not apply."); *Comcast of Los Angeles, Inc. v. Top End Int'l, Inc.*, 2003 WL 22251149, at *3 (C.D. Cal. July 2, 2003) ("[T]he privilege against self-incrimination only protects natural persons, not

artificial entities such as corporations."). Since corporations cannot invoke the Self-incrimination Clause in *any* context, whether in a civil forfeiture case or otherwise, UMCC's argument cannot prevail.

█ Consequently, UMCC's request that *Simmons* immunity apply to the Feil declaration and the accompanying state court motions must be rejected in its entirety.[25] *Simmons's* "intolerable choice" is inapposite where the Self-incrimination Clause's reach is absent.

### 3. "Taint" and the Fruit of the Poisonous Tree

Even though UMCC cannot invoke the Fifth Amendment, it has asserted that the Feil declaration is a tainted fruit of the previously suppressed search and seizure of the defendant currency.[26] UMCC ex-

---

**25.** UMCC has also raised for the first time in its reply brief an amorphous Due Process claim based on the "Hobson's Choice" it faced between abandoning its property in state court and admitting its ownership interest that could result in a forfeiture in federal court. (Cl. Reply at 15.) UMCC failed to cite any case law for this proposition. In any event, because the Self–Incrimination Clause does not apply, the feared Hobson's Choice in a civil proceeding is not persuasive for purposes of an independent due process claim. *Cf. Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[A]side from the privilege against compelled self-incrimination, the Court has consistently recognized that in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause."); *United States v. Talco Contractors, Inc.*, 153 F.R.D. 501, 508 (W.D.N.Y. 1994) ("[W]hen the mere consequence of asserting the privilege is the unavailability of the litigant's testimony on an issue which may in the normal course of things result in a judgment in favor of the opposing party because no other evidence exists, no violation of due process occurs."). Thus, the fact that UMCC's silence may have prevented it from prevailing on a motion for the return of property does not by itself create a separate Due Process concern.

Additionally, it is unremarkable that UMCC may have opened itself to a federal forfeiture proceeding as a consequence of its efforts to recover the defendant currency from state court. If a party deems it necessary to admit (in effect) to a violation of federal law in order to demonstrate that a given act did not also violate state law, he/she must accept the consequences of this gamble. Not every purported "Catch–22" implicates the Constitution.

**26.** The Fourth Amendment applies to civil forfeiture actions and to corporations. *See United States v. 4,432 Mastercases of Cigarettes, More Or Less*, 448 F.3d 1168, 1176 (9th Cir.2006) ("The protection against unreasonable searches and seizures extends to commercial premises, and it also applies in the context of civil forfeiture proceedings.") (internal citations omitted); *see also G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) ("The respondents do not contend that business premises are not protected by the Fourth Amendment. Such a proposition could not be defended in light of this Court's clear holdings to the contrary. Nor can it be claimed that corporations are without some Fourth Amendment rights.") (internal citations omitted); *Okla. Press Pub Co. v. Walling*, 327 U.S. 186, 205–06, 66 S.Ct. 494, 90 L.Ed. 614

plains that it would have had no reason to file the Feil declaration, as part of its motion to return illegally seized property, but for the LAPD's search. The Government responds that the state court filing was wholly voluntary and represented an act of free will.

■ When a Court holds that a search has violated the law, there will frequently be disputes over whether subsequently obtained evidence is the fruit of the poisonous tree. The question becomes "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal citation and quotation marks omitted). "There are three exceptions to this exclusionary rule: (1) the independent source exception; (2) the inevitable discovery exception; and (3) the attenuated basis exception." *United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir.2003). The Government has not claimed that the Feil declaration could be utilized under either the inevitable discovery or independent source doctrines. *See Nix v. Williams*, 467 U.S. 431, 443–47, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Instead, the Government focuses on the argument that there is no factual connection between the search and seizure to the Feil Declaration. Alternatively, the Government asserts that the voluntariness of the state court filing sufficiently attenuates the taint such that the primary illegality is purged. *See Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ("The voluntariness of the statement is a threshold requirement.").

In the Ninth Circuit, "[t]he Government must prove that particular evidence or tes-

timony is not fruit of the poisonous tree, but a defendant [or claimant] has the initial burden of establishing a factual nexus between the illegality and the challenged evidence." *United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir.1980). In effect, this amounts to a two part test: (1) factual nexus, and (2) attenuation. Once the factual nexus is established, the Government can establish the taint's attenuation by relying on various factors such as: (1) temporal proximity; (2) intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254. A few courts have held that the Government's burden can only be met with "clear and convincing evidence." *Collins v. Beto*, 348 F.2d 823, 827 (5th Cir.1965) (Tuttle, C.J.); *United States v. Briley*, 2005 WL 736656, at *8 n. 3 (N.D.Ill. Mar. 31, 2005).

■ Testimony from a witness can at times constitute a tainted fruit of the poisonous tree. *Kandik*, 633 F.2d at 1335; *see also United States v. Ceccolini*, 435 U.S. 268, 274–75, 98 S.Ct. 1054, 55 L.Ed.2d 268 (rejecting suggestion that the Court "adopt what would in practice amount to a *per se* rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment"). However, the attenuated taint exception is "applied more generously when the challenged derivative evidence is live-witness testimony than when it is documentary evidence." *United States v. Ramirez–Sandoval*, 872 F.2d 1392, 1396 (9th Cir.1989). This is because "[w]itnesses can, and often do, come forward and offer evidence entirely of their own volition." *Ceccolini*, 435 U.S. at 276, 98 S.Ct. 1054. A Court's decision regarding the possible attenuation of taint as to

---

(1946) ("[T]he Fourth Amendment has been held applicable to corporations notwithstand-

ing their exclusion from the privilege against self-incrimination.").

witness testimony should be based on: (1) the witness' willingness to testify; (2) the role played by the illegality; (3) the proximity between the illegal behavior and the testimony; and (4) the police's motivation. *See United States v. Reyes,* 157 F.3d 949, 954 (2d Cir.1998).

UMCC contends that it is impossible to attenuate the taint where the underlying illegality resulted from a search as opposed to an arrest. As discussed by the definitive treatise in the field, the *Brown* factors are "ordinarily unnecessary" in such a case:

> In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with incriminating evidence they had illegally seized, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about the evidence or the crime to which it relates. This is because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak."

6 LaFave, *supra,* § 11.4(c) (citations omitted). UMCC avers that Feil's declaration resulted from an illegal search, and therefore must be suppressed as a tainted fruit. On the other hand, the Government cites to *Carnejo–Molina v. INS,* 649 F.2d 1145 (5th Cir.1981), in which a confession's taint from an earlier illegal search was held to be attenuated as a result of: (1) a five-week passage in time; (2) reliance on the advice of counsel; and (3) the "voluntariness" of her statements.

Nonetheless, based on *United States v. Crawford,* 372 F.3d 1048 (9th Cir.2004), UMCC insists that the Ninth Circuit has rejected the argument that the taint arising from an illegal search can be attenuated. This Court is not convinced that *Crawford* necessarily has the effect UMCC

suggests. In effect, *Crawford* only applied the first part of the two-part *Kandik* test. First, there must be some connection between the illegal search and the after-acquired evidence. *Id.* at 1058. *Crawford* did not reach the question of attenuation— the second part of the analysis—because the defendant had failed to establish the necessary connection on the first point. *Id.* at 1058–59 Although attenuation may be more difficult for the Government to prove where the original illegality was a search as opposed to a detention, attenuation is possible depending upon the facts of the particular case.

In terms of *Kandik,* UMCC raises a valid point when arguing that there is a factual nexus between the illegal search and the Feil declaration, because it "is in some sense the product of illegal government activity." *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). The Government cites to *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), for the uncontroversial rule that a "but for" link between an illegal search and evidence later obtained is insufficient to suppress the latter. In *Harris,* the Court refused to suppress a statement taken outside the home where the initial in-house arrest was unconstitutional due to the lack of a search warrant, exigent circumstances, or consent. The Court reasoned that the "statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else." *Id.* at 20, 110 S.Ct. 1640; *see also Crawford,* 372 F.3d at 1058 ("In this case, the necessary connection between the presumed illegal parole search and Defendant's later confession at the FBI office is missing. The search, which produced no evidence whatsoever, had no bearing on the officers' decision to question Defendant."). In comparison to *Harris,* it is difficult to under-

stand how the Feil declaration was not causally connected to the suppressed seizure. The declaration, and the accompanying motions, were submitted for the very purpose of counteracting the consequences of the LAPD's March 15, 2005 seizure.

However, the Court is somewhat troubled by the concept that statements made by a party in open court can be construed as the fruit of the poisonous tree, whether viewing the case from a factual nexus or attenuation perspective. This concern is further exacerbated by the fact that the parties have not identified a similar case on point, and have instead relied on case law espousing general Fourth Amendment principles. The Court also has difficulty accepting UMCC's tainted fruit argument for several other reasons.

### a. *Simmons—Part Two*

If UMCC is correct in arguing that the Feil declaration is a tainted fruit of the poisonous tree, then *Simmons's* very rationale would be substantially undercut. In creating the doctrine of judicial use immunity, the Supreme Court explained that:

> It seems obvious that a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof of standing necessary to assert a Fourth Amendment claim. *The likelihood of inhibition is greatest when the testimony is known to be admissible regardless of the outcome of the motion to suppress.* But even in jurisdictions where the admissibility of the testimony depends upon the outcome of the motion, there will be a deterrent effect in those marginal cases in which it cannot be estimated with confidence whether the motion will succeed.

390 U.S. at 392–93, 88 S.Ct. 967 (emphasis added). The above passage implies that even if a defendant is successful in sup-

pressing an illegal search or seizure in a criminal action, testimony resulting from his/her need to establish standing to challenge a purportedly unconstitutional search would not constitute a tainted fruit of a Fourth Amendment violation. Indeed, the Ninth Circuit has always understood testimony given to establish standing for a motion to suppress as a Fifth Amendment concern, not (in the event that the motion is successful) a tainted fruit of a Fourth Amendment violation. *See, e.g., Stuard v. Stewart,* 401 F.3d 1064, 1067 (9th Cir.2005) ("In *Simmons,* the only way the defendant could show standing to assert his Fourth Amendment rights against a search of his luggage was to testify that it was his luggage, but compelling him to testify would violate his Fifth Amendment right not to incriminate himself."); *United States v. Eshkol,* 108 F.3d 1025, 1028 (9th Cir.1997) ("In *Simmons,* the Supreme Court held that a defendant should not be made to forfeit his Fifth Amendment privilege against self-incrimination in order to protect his Fourth Amendment rights."). If statements made to demonstrate standing in a successful suppression motion are the tainted fruit of an illegal search, then the feared "intolerable choice" cited in *Simmons* would only be relevant when a suppression motion failed. Because no court has ever read this limitation into *Simmons,* it is obvious that UMCC's state court motion could only be considered a Fifth Amendment concern. Of course, the Fifth Amendment cannot be invoked by UMCC because it is a corporation, among other reasons.

The fact that no Court has ever apparently accepted UMCC's position is consistent with certain aspects of an attenuation analysis. By the time such a motion is filed, significant time has passed and there have undoubtedly been intervening circumstances (*e.g.*, the hiring and reliance on the advice of counsel). Such facts tend to

support the position that the taint of an illegal search is attenuated, as a matter of law, by the time a party files either a motion to suppress or a motion for the return of property. This is why the Fifth Amendment is implicated when the criminal defendant testifies at an evidentiary hearing in order to establish standing, not the Fourth Amendment.

At its core, UMCC's tainted fruit theory is essentially a disguised reincarnation of its failed *Simmons* argument.

### b. Harrison—A Possible Analogy

Though not cited by either party, the Court has identified the case *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), as possibly relevant to UMCC's argument. Read at face value, *Harrison's* logic could be understood as helpful to UMCC's position. However, the case has had an extremely limited application.

*Harrison* is a close cousin of *Simmons. See United States v. Baker*, 850 F.2d 1365, 1370 (9th Cir.1988) (juxtaposing the two doctrines). In *Harrison*, the defendant testified at his first trial after the court admitted three confessions into evidence over his objection. His conviction was overturned on his first appeal because the confessions were obtained in violation of federal (though not constitutional) law. *Harrison v. United States*, 359 F.2d 214 (D.C.Cir.1965). On remand, the prosecutor was allowed to introduce defendant's testimony from the first trial, and he was again convicted. The Supreme Court reversed the second conviction, holding that the defendant's testimony from the first trial was a tainted fruit of the illegally introduced confessions. 392 U.S. at 225–26, 88 S.Ct. 2008.

In reaching this conclusion, the Court explained that "[t]he question is not whether the petitioner made a knowing decision to testify, but why. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* at 223, 88 S.Ct. 2008. Because the defendant was "impelled" to testify at trial in order to counteract the effect of the confessions, the prosecution was prohibited from utilizing his live testimony from the first trial against him at his second trial after remand.[27] *See also United States v. Mettetal*, 2001 WL 1013230, at *6 (W.D.Va. Aug.31, 2001) ("Under *Harrison*, the appropriate inquiry is whether the admission of the illegally obtained evidence induced Mettetal to take the stand to testify and, in doing so, make a number of admissions that might not have come out but for that testimony.")

Although the argument has not been made, it would be fairly reasonable to analogize *Harrison* to UMCC's state court predicament. When a claimant files court documents in order to have his/her property returned, it is substantively similar to when a criminal defendant decides to testify in response to the introduction of illegally obtained evidence at trial. As with UMCC, the *Harrison* defendant certainly had an opportunity to reflect and consult with counsel before deciding on a course of action, but this was not dispositive. UMCC filed the Feil declaration and motion for return of property for the same reason that the *Harrison* defendant testified at trial—they were "impelled" responses aimed at remedying the Govern-

**27.** In dissent, Justice White was critical of the Court's argument that "impelled" testimony could be a fruit of the poisonous tree. *Id.* at 230, 66 S.Ct. 494 (White, J., dissenting)

("Harrison's testimony at the second trial, the Court now says was not 'compelled' but only 'impelled' by the confessions.... I disagree.").

ment's actions. By holding nearly $200,000 in UMCC's funds, the LAPD indirectly induced UMCC's motion for the return of property. Thus, *Harrison* has some force on a theoretical level.

It is also noteworthy that the facts of a traditional attenuation case are far different from those presented here. Such cases typically involve a defendant who was subjected to an illegal arrest (or seizure), but later makes incriminating statements after substantial time has passed and/or other intervening events have occurred. The Feil declaration was filed not as a statement conceding guilt, but as part of a vigorous effort to remedy an allegedly defective search. It is true that the Feil declaration was filed after a significant passage of time and that it was the result of advice with UMCC's counsel. Yet, the Court is cognizant of the fact that the Feil declaration resulted from the LAPD's (or some similar government actor's) continuing control and dominion over nearly $200,000 in currency that was seized improperly. Such facts are difficult to square with an ordinary attenuation case.

Furthermore, there are certain policy concerns to consider. When an illegal seizure of currency is effectuated, a claimant will typically take some remedial action to avoid the deprivation of this property. The Government believes it can use such statements to create the probable cause necessary to file this action. It is well-known that law enforcement agencies benefit from the spoils of civil forfeitures. *See United States v. Real Property Located in El Dorado County at 6380 Little Canyon Road,* 59 F.3d 974, 984 (9th Cir.1995) ("Forfeitures, in effect, impose an impressive levy on wrongdoers to finance, in part, the law enforcement efforts of both the state and national governments. To that end, and to that extent, crime *does* pay."); *United States v. Funds Held in the Name or for the Benefit of Wetterer,* 210 F.3d 96,

110 (2d Cir.2000) ("[T]he agency that conceives the jurisdiction and ground for seizures, and executes them, also absorbs their proceeds. This arrangement creates incentives that evidently require a more-than-human judgment and restraint."). Absent exclusion, the LAPD would in certain respects financially benefit from the initial illegality. But a Court's visceral reaction is not enough. "[L]et us remember that this court does not sit as a kind of super-Citizens' Police Review Board, creating some set of federal common-law police regulations for local law enforcement officers in this circuit by distinguishing, on a case-by-case basis, 'good' police conduct from 'bad.'" *United States v. Orso,* 275 F.3d 1190, 1190–91 (9th Cir.2001) (O'Scannlain, J., concurring in the denial of an en banc rehearing).

And like *Simmons,* efforts to invoke *Harrison* or to extend it into other realms have not fared well. Some district courts have even suggested that *Harrison* was impliedly overruled by the Supreme Court's decision in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). *See, e.g., Perri v. Director, Dep't of Corrections,* 817 F.2d 448, 450 n. 2 (7th Cir.1987) ("The district court believed that *Harrison* has been overruled *sub silentio* by recent 'fruit of the poisonous tree' Supreme Court cases such as [*Elstad* ]."); *Kordenbrock v. Scroggy,* 889 F.2d 69, 80 n. 5 (6th Cir.1989) ("The District Court also held that *Elstad* implicitly overruled Harrison."). The Court does not necessarily agree with the position taken by these district courts. Indeed, *Elstad* cited to *Harrison* with approval. 470 U.S. at 316–17, 105 S.Ct. 1285 ("If the prosecution has actually violated the defendant's Fifth Amendment rights by introducing an inadmissible confession at trial, compelling the defendant to testify in rebuttal, the rule announced in [*Harrison* ], precludes use of that testimony on retrial.") At the least,

such district court pronouncements are indicative of Harrison's feebleness. Throughout its nearly forty year life, *Harrison* has been repeatedly raised by lower courts for the purpose of distinguishing and limiting its effect.

For example, courts have held that *Harrison* does not apply where a defendant testifies in response to evidence that is merely inadmissible under state law or the rules of evidence. *See United States v. Gianakos*, 415 F.3d 912, 919 (8th Cir.2005) ("[The witness's] testimony-which proved to be inadmissible under state law-was not illegally obtained, and hence was not constitutionally suspect. [Defendant] may have determined that his testimony was strategically necessary for his defense, but it was not because the government had illegally obtained evidence in violation of his constitutional rights."); *United States v. Bohle*, 475 F.2d 872, 876 (2d Cir.1973) ("We see no reason to extend the 'fruits' doctrine to testimony 'impelled' by mere evidentiary hearsay error, as distinct from unconstitutional police practices."). In addition, *Harrison* is unavailing when a defendant testifies in support of a co-defendant, even though that co-defendant would not have been charged but for the illegal search. *United States v. Duchi*, 944 F.2d 391, 395 (8th Cir.1991). The Ninth Circuit has also manifested a somewhat hostile approach toward *Harrison. See United States v. Mortensen*, 860 F.2d 948, 951 (9th Cir.1988) ("Mortensen asks this court to create a new rule that would extend *Harrison* to proceedings that are non-final. This extension far exceeds *Harrison's* teachings.").

Even if its rule survives *Elstad* in some form, there is good reason to believe that the Supreme Court today would have rejected the fruit of the poisonous tree's utilization in *Harrison* itself. As stated by one commentator:

> [C]onsidering the case's particular facts, it must be said that *Harrison* would probably be decided differently today.... The poisonous tree in *Harrison* consisted of mere *McNabb–Mallory*[28] violations, not coerced confessions, and in *Elstad* the Court indicated that nowadays the poisonous tree doctrine only applies to evidence stemming from constitutional violations.

Yale Kamisar, *On the "Fruits" of Miranda Violations, Coerced Confessions, and Compelled Testimony*, 93 Mich. L.Rev. 929, 998–99 (1995). Yet, *Harrison* may still have resonance where the initial illegality amounts to a constitutional violation, and was not a mere transgression of some non-constitutional rule. Thus, according to the Third Circuit in *United States v. Pelullo*, 173 F.3d 131 (3d Cir.1999), "*Harrison* mandated what is essentially an exclusionary rule inquiry where there appears to be a link between a constitutional violation and a defendant's subsequent decision to take the stand." *Id.* at 136. Consequently, "the government had to prove that Pelullo's decision to testify at the first trial was not caused by the *Brady* violation." *Id.* at 134. Thus, one threshold question to be answered, *infra*, is whether the seizure of the defendant currency was excluded on constitutional grounds.

While the theory underlying *Harrison's* rule is worthy of consideration, it is doubtful that it would be applied to UMCC even in a best-case scenario. *Harrison* has rarely been extended by any court beyond

---

**28.** Under the *McNabb–Mallory* rule, "the exclusionary rule applies to confessions obtained in violation of a defendant's right to be brought promptly before a judicial officer." *United States v. Lombera–Camorlinga*, 206 F.3d 882, 894 (9th Cir.2000). But as explained by Kamisar, this does not mean that the exclusionary rule applies to evidence derived from the suppressed confession.

its particular facts and likely only applies where a criminal defendant takes the stand at his/her trial. Given *Simmons's* and *Harrison's* limited effect, it appears that declarations and briefs filed by a corporation for the purpose of establishing standing, as part of a motion for the return of illegally seized property, are *per se* attenuated from the primary taint.

### c. Derivative Evidence and Rule 41 Violations

Even assuming *Harrison's* plausible relevance, the question is whether the fruit of the poisonous tree doctrine may be invoked as to the Feil declaration and the related state court motions. It cannot be ignored that the LAPD had probable cause to believe UMCC was violating federal law. *See supra* note 18. In its August 16, 2006 Order, the Court noted that there was no evidence suggesting that Fukuda or Judge Sandvig had federal crimes on their mind. Thus, the Court stated that the lack of probable cause under state law should "end the matter." (Order at 19.) But upon further reflection, and for the reasons stated in this Order, the Court no longer holds that view.

■ It simply does not matter whether a state police officer believed he/she was enforcing state or federal law when securing and executing the warrant. This is because "the probable cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *United States v. Ross*, 456 U.S. 798, 808, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). While the LAPD's warrant lacked probable cause under state law, the search was excluded for purposes of a federal violation because the warrant failed to meet the procedural requirements of Rule 41. For example, if the Drug Enforcement Agency had been called by the LAPD on March 15, 2005, and Rule 41 was thereafter followed, the search would not have been suppressed. In such a circumstance, the failure to have probable cause under state law would have been wholly *irrelevant.* The Court cannot accept that the Fourth Amendment is violated simply because a state officer obtains a warrant from a state magistrate, even though probable cause only exists with respect to a potential federal violation. Thus, the "poisonous tree" in this case is merely a non-constitutional Rule 41 violation.

### i. There was No Constitutional Violation Based on a Possible Federal Narcotics Crime

For purposes of a federal crime, the warrant was deficient only because it failed to comport with any of the Rule 41 procedural requirements. There was no separate constitutional violation.

■ In its prior briefing, UMCC employees alleged that searches had begun before the state search warrant had been issued. Even if true, this fact would not affect the constitutionality of the search. This is because "[n]one of the information on which the warrant was secured was derived from or related in any way to . . ." these alleged searches; such searches would have also been unnecessary to obtaining a warrant for a suspected federal crime. *See Segura v. United States,* 468 U.S. 796, 814, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). There would have been probable cause for the search under federal law had these purported searches never occurred. *See id.* Admittedly, the defendant currency was not recovered until after the search warrant was executed.

■ UMCC has also noted that currency was not an item sought on the search warrant. But the warrant did authorize the LAPD to search for sales receipts, as well as evidence relating to the

sale of marijuana. In light of these duties, Officer Thomas appropriately searched UMCC's cash registers and safes. Once searching within these areas pursuant to a warrant, Thomas could seize other items in plain view where it was "immediately apparent . . . that they constituted incriminating evidence." *Horton v. California*, 496 U.S. 128, 142, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The fact that Thomas's discovery of the currency was perhaps intentional, and not "inadvertent," does not affect the analysis. "What matters is whether the officers looked in places or in ways not permitted by the warrant." *United States v. Ewain*, 88 F.3d 689, 695 (9th Cir.1996). Thomas properly searched UMCC's cash registers and safes. And given the undisputed context of the search, it was immediately apparent that the defendant currency represented the proceeds of federal narcotics violations.

■ Moreover, UMCC claims that it did not receive a full copy of the warrant during the search. It also appears that the LAPD began the search resulting in the currency's discovery before a physical copy of the warrant was actually brought to UMCC. As to the first point, in *United States v. Grubbs*, 547 U.S. 90, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006), the Court recently held that there is no "constitutional requirement that the warrant be exhibited at the outset of the search, or indeed until the search has ended." *Id.* at 1501 (quoting *United States v. Stefonek*, 179 F.3d 1030, 1034 (7th Cir.1999)); *see also id.* (noting that as to argument that "the executing officer must present the property owner with a copy of the warrant before conducting his search," "neither the Fourth Amendment nor [Rule 41] imposes such a requirement"). As explained by the Court, the warrant is not issued in order to allow property owners the right to monitor the police; the magistrate judge monitors the police by deciding whether a warrant should be issued beforehand, while an aggrieved party can file a motion to suppress thereafter. *Id.* The fact that UMCC may not have been provided a full copy of the warrant that evening is inconsequential.

For the same reason, the LAPD's decision to begin the search before the warrant was physically present at UMCC is unimportant. Since citizens are not entitled to a right to monitor police searches, pursuant to *Grubbs*, there is no reason to impose such a formalistic requirement. Problems regarding the warrant can be remedied in court after the search is completed.[29]

### ii. Whether to Exclude the Fruits of Non–Constitutional Violations

■ UMCC asserts that the Feil declaration (and its other state court motions) are tainted fruits. In terms of the federal narcotics law, the March 15, 2005 search was suppressed solely based on the LAPD's failure to observe non-constitutional aspects of Rule 41. And as previously discussed, it is likely that *Harrison's* exclusionary rule could only be utilized where the initial illegality stems from a constitutional violation.

In determining whether the poisonous tree doctrine is applicable, it is useful to begin with reference to the Self-incrimination Clause and *Miranda*. "The *Miranda* exclusionary rule . . . sweeps more broadly than the Fifth Amendment itself." *Elstad*, 470 U.S. at 306, 105 S.Ct. 1285. Since *Miranda* goes beyond the Fifth Amendment, it has often been referred to as a "prophylactic" rule. Thus, although an un-Mirandized confession will be excluded

---

**29.** UMCC never specifically asked for the warrant to be suppressed for these reasons, but the Court addresses these issues prophylactically.

from the Government's case-in-chief, a subsequent Mirandized confession will not be suppressed via the fruit of the poisonous tree doctrine.[30] *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285 ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."). Similarly, the Supreme Court has upheld the introduction of witness testimony discovered through an unwarned confession, *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), as well as physical evidence derived from a *Miranda* violation. *United States v. Patane,* 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).[31] Furthermore, confessions made subsequent to a violation of *Edwards*'[32] prophylactic rule will not be excluded as a tainted fruit. *See Greenawalt v. Ricketts,* 943 F.2d 1020, 1026 (9th Cir.1991) ("[W]e hold that a voluntary confession inadmissible on the ground of *Edwards* does not taint a subsequent voluntary confession.").

Rule 41 is analogous to *Miranda.* Both are prophylactic rules. Rule 41 is designed to help enforce the Fourth Amendment with regard to federal crimes, while *Miranda* does the same for the Fifth Amendment as to all crimes. A violation of both rules can result in the exclusion of the immediate fruits—*e.g.,* the items seized in a search, or an un-Mirandized confession. Thus, the Court concludes that the fruit of the poisonous tree doctrine should not apply to evidence derived from a Rule 41 violation, even where the search itself has been suppressed, because the same would be true for a *Miranda* violation.

■ The Court is guided by the Fifth Circuit's decision in *United States v. Tedford,* 875 F.2d 446 (5th Cir.1989). On February 3, 1988, at 11:00 p.m., a magistrate approved a federal search warrant for the defendant's property. *Id.* at 447. Because the magistrate did not state that the search could be executed at night, the initial search violated Rule 41(c)(1). *Id.* at 450. After the first search, the defendant then consented to a second search of his storage unit that resulted in the recovery of firearms. *Id.* at 447–48. The Court held as follows:

> Insofar as [Defendant] relies on this violation to suppress evidence obtained during a subsequent search, he must invoke the derivative evidence rule.

**30.** Based on Justice Kennedy's controlling concurrence in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the *Elstad* rule against exclusion can be overcome in rare cases where law enforcement take intentional and calculated steps to subvert *Miranda. Id.* at 621–22, 124 S.Ct. 2601. However, there is no evidence that the LAPD intentionally and deliberately subverted Rule 41.

**31.** In *Dickerson v. United States,* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Court held that *Miranda* is a "constitutional rule" that cannot be superseded by congressional legislation. This pronouncement stirred some confusion among the circuits as to whether a violation of *Miranda* was equivalent to a violation of the Constitution. *See United States v. Villalba–Alvarado,* 345 F.3d 1007, 1016–18 (8th Cir.2003) (discussing an emerging split among the circuits). As a "constitutional rule," it became unclear whether a *Miranda* violation would necessitate the application of the fruit of the poisonous tree doctrine to all derivative evidence. Five members of the Supreme Court rejected this notion in *Patane,* 542 U.S. at 643, 124 S.Ct. 2620 (Opinion of the Court); *see also id.* at 644–46, 124 S.Ct. 2620 (Kennedy, J., concurring).

**32.** Under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), once a suspect invokes the right to counsel, the police cannot engage in further interrogation unless it is initiated by the suspect. *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

The derivative evidence rule, also known as the "fruit of the poisonous tree doctrine," requires exclusion of evidence that is the indirect product or "fruit" of unlawful police conduct. Although these cases involve Fourth Amendment violations, the Supreme Court has also applied the derivative evidence rule where Fifth or Sixth Amendment violations have occurred. The "fruit of the poisonous tree doctrine" is not triggered, however, by a rule violation that does not rise to constitutional proportions.

The Supreme Court has distinguished violations of *Miranda's* "prophylactic" procedures from Fifth Amendment violations, concluding that a mere departure from *Miranda* does not require exclusion of derivative evidence. Similarly, we have held that a violation of *Miranda's* "prophylactic" rule is insufficient to trigger the "fruit of the poisonous tree doctrine."

We believe this reasoning applies with equal force to violations of Rule 41. A violation of Rule 41(c) alone does not trigger the derivative evidence rule. Of course, [Defendant] might be able to rely on the "fruit of the poisonous tree doctrine" if he established that the officers violated his Fourth Amendment rights. However, [Defendant] does not contend that the nighttime search violated the Constitution.

*Id.* at 450–51. The Court is persuaded by *Tedford's* analysis, and agrees that evidence derived from a mere violation of Rule 41 should not be excluded as the fruit of a poisonous tree. It is one thing to suppress the currency seized during the search itself, but yet another to invoke the fruit of the poisonous tree doctrine in order to exclude the Feil declaration and other briefs submitted to the state court months later. The Feil declaration does not constitute a tainted fruit because the search would not have been suppressed had the LAPD observed Rule 41. The

Fourth Amendment was not implicated, and the lack of probable cause under state law does not change this result.

### iii. Enforcement of Rule 41

The Court recognizes that, in terms of the federal narcotics laws, the LAPD completely failed to meet Rule 41 procedural requirements (*e.g.,* request made by a federal officer, must obtain approval from a magistrate judge unless one is not available). However, excluding the Feil declaration would not further Rule 41's enforcement, which the LAPD could have satisfied by making contact with federal officials.

UMCC's state court motion was not in response to the LAPD's violation of Rule 41. The motion was clearly an effort to demonstrate to the state court that UMCC was operating within the permissible confines of California's medical marijuana laws. Such statements are not relevant to Rule 41 violations. Had UMCC been in federal court and challenged a seizure based on Rule 41, it would have had no need to concede that the defendant currency was "used in the course" of its marijuana sales. (Biczo Decl. Ex. E at 92.) UMCC could have simply stated that it was the owner of the currency, focused its arguments on the Rule 41 violations, and avoided the concession of any nexus between the currency and marijuana sales. An exclusion of the Feil declaration would therefore not encourage other parties to challenge Government seizures based on Rule 41.

### IV. CONCLUSION

For the foregoing reasons, UMCC's converted motion for summary judgment is DENIED. The doctrine of judicial estoppel does not apply under the facts of this case. *Simmons* is inapposite for several reasons, including the fact that corporations cannot avail themselves of the Self-

incrimination Clause. Finally, the derivative evidence rule does not bar the use of the Feil declaration and the accompanying state court motions based on a violation of Rule 41. As a result, the Feil declaration provided the Government with sufficient untainted probable cause to file this forfeiture action. The Government may therefore proceed with the discovery that it has not yet completed. The next logical step would be for the Government to move for forfeiture on a motion for summary judgment.

The Court hereby ORDERS the parties to attend a status conference on August 27, 2007, at 1:30 p.m. in order to discuss how the case shall proceed. In particular, the Court anticipates setting dates for a Government's motion for summary judgment.

IT IS SO ORDERED.